UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
LOUISIANA

| | |
|---|---|
| DENISE A. BADGEROW,<br>on behalf of herself and a class<br>of those similarly situated,<br>Plaintiffs,<br>v.<br><br>REJ PROPERTIES, INC. D/B/A WALTERS,<br>MEYER TROSCLAIR & ASSOCIATES,<br>AND<br>AMERIPRISE FINANCIAL SERVICES,<br>INC. | * Case No.: 2:17-cv-09492<br>*<br>* JUDGE: JAY C. ZAINEY<br>*<br>*<br>*<br>*<br>* MAGISTRATE: JOSEPH C.<br>* WILKINSON, JR.<br>*<br>*<br>*<br>* |

## FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

Plaintiffs through undersigned counsel, brings this action against REJ PROPERTIES, INC. ("REJ"), Walters, Meyers, Trosclair & Associates, an unincorporated business partnership ("WMT"), Thomas Meyer ("Meyer"), Greg Walters ("Walters"), and Ray Trosclair ("Trosclair", and together with REJ, WMT, Meyer and Walters, collectively referred to as "Defendants") and respectfully alleges, as follows:

### INTRODUCTION

This lawsuit seeks monetary relief and other damages for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981, *et seq.*, the Equal Pay Act of 1963, as amended, 29 U.S.C. §§ 206(d), Louisiana laws prohibiting intentional discrimination and retaliation in employment, La. R.S. § 23:301 *et seq.* (the "LEDL"), La. Rev. Stat. Ann. § 23:967 (the "Louisiana Whistleblower Statute"), and La. Rev. Stat Ann § 51:1401, *et. seq* (the "Louisiana Unfair Trade Practices Act").

1

# THE PARTIES

1. Plaintiff Denise A. Badgerow ("Badgerow"), is an individual residing in the Parish of Lafourche, State of Louisiana.

2. In addition to bringing this action on behalf of herself, Badgerow also brings this action on behalf of a class of similarly situated current and former female AFAs employed by REJ in the United States (the "Class" sometimes collectively with Badgerow referred to as "Plaintiffs"), in order to end WMT's discriminatory policies and practices and to make the Class whole.

3. Defendant REJ Properties, Inc. ("REJ"), a Louisiana business corporation, domiciled in the Parish of Lafourche, State of Louisiana, and may be served through its Registered Agents: Gregory A. Walters and Thomas J. Meyer, 132 Rue Collette, Suite A, Thibodaux, LA 70301.

4. Defendant, Walters, Meyer, Trosclair & Associates ("WMT") is an unincorporated business partnership, domiciled in the State of Louisiana.

5. Thomas Meyer, is domiciled in the Parish of Lafourche, State of Louisiana, and is a fifty percent shareholder of REJ and a partner in Walters, Meyer, Trosclair & Associates.

6. Defendant Greg Walters is domiciled in the Parish of LaFourche, State of Louisiana, and is a fifty percent shareholder of REJ.

7. Defendant Ray Trosclair is domiciled in the Parish of Ascension, State of Louisiana and is a partner in Walters, Meyer, Trosclair & Associates.

8. At all relevant times, REJ continuously had at least 15 employees. REJ is an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e (b), (g), and (h).

9. At all relevant times, WMT continuously had at least 15 employees. WMT is an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g), and (h) of

Title VII, 42 U.S.C. §§ 2000e (b), (g), and (h).

## JURISDICTION AND VENUE

10. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1337, and 1343. This action is authorized and instituted pursuant to Sections 706(f)(1), (3), and 706(g), as amended, 42 U.S.C. §§ 2000e-5(f)(1), (3), and (g), and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. Badgerow also invokes supplemental jurisdiction of this court over Plaintiffs' state law claims against REJ pursuant to 28 U.S.C. §1367, as the common law claims form part of the same case or controversy arising from violations of Louisiana statutes.

11. Venue is proper pursuant to 42 U.S.C. § 2000e-5 and 28 U.S.C. § 1391(b) as one or more of the alleged unlawful employment practices were committed within the jurisdiction of the United States District Court for the Eastern District of Louisiana.

12. This action is brought to remedy discrimination on the basis of sex, hostile work environment and disparate treatment, in the terms, conditions, and privileges of employment for Plaintiffs and to remedy the retaliation against Badgerow for engaging in activity protected under Title VII.

13. This action is further brought to remedy the unfair trade practices of REJ and/or WMT.

14. This action is brought to remedy the retaliation of REJ and/or WMT by terminating Plaintiff for engaging in protected activity under the Louisiana Whistleblower Statute.

15. Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. §2000e (f) and (g) and La. R.S. 23:301 *et seq.*

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. On or about March 6, 2015, Badgerow filed a Charge of Discrimination against Walters, Meyer, Trosclair & Associates (REJ Properties, Inc.) with the Equal Employment Opportunity

Commission on behalf of herself and the Class. Badgerow was issued a Dismissal and Notice of Rights on June 27, 2017. All conditions precedent to the institution of this lawsuit have been fulfilled.

## ALLEGATIONS

17. Walters, Meyer, Trosclair & Associates ("WMT") was private wealth advisory practice of Ameriprise Financial Services Inc. ("Ameriprise"), whose partners were Thomas Meyer, Gregory Walters, and Ray Trosclair.

18. WMT advertised on Ameriprise's website and in billboards and other media as "Walters, Meyer, Trosclair & Associates."

19. Plaintiff received a written offer of employment letter from REJ Properties, Inc.

20. Plaintiff received her paychecks and W2 statements from REJ Properties, Inc.

21. REJ Properties, Inc. was a Louisiana corporation that received income from the partnership of WMT in order to pay expenses of the practice of WMT, including the compensation of Badgerow.

22. At all relevant times, Greg Walters was a Director of REJ Properties, Inc., owning fifty percent of the shares in REJ.

23. At all relevant times, Thomas Meyer was a Director of REJ Properties, Inc., owning fifty percent of the shares in REJ.

24. Walters, Meyer and Trosclair each individually received commission compensation from Ameriprise from the sale of securities and other services performed in connection with the unincorporated partnership, Walter, Meyer, Trosclair, & Associates.

25. Walters, Meyer and Trosclair had an unwritten partnership agreement to pool the income from the gross dealer compensation received from their Broker-Dealer, Ameriprise and to contribute these funds to REJ Properties, Inc. in order that REJ Properties Inc. would pay the rent and expenses of the unincorporated partnership, WMT.

26. The partners, Walters, Meyer and Trosclair contributed only enough capital to REJ Properties, Inc. to pay for the expenses of WMT.

27. Walters and Meyer owned, operated and controlled REJ Properties, Inc. as a mere instrumentality of WMT, their unincorporated partnership with Trosclair.

28. REJ was the alter ego of WMT, Walters, Meyer and Trosclair.

29. That REJ was grossly undercapitalized, as it was only capitalized with funds to cover the expenses of WMT and was not capitalized with the full commissions received in connection with the business operations of WMT's practice.

30. REJ failed to adhere to corporate formalities by failing to file annual reports.

31. That REJ failed to adhere to corporate formalities by failing to record corporate minutes of meetings of shareholders.

32. To the extent that a corporate shell separates Walters, Meyer, Trosclair & Associates, an unincorporated partnership, from REJ, any corporate protection should be disregarded.

33. REJ failed to maintain an arm's length relationship with WMT and other entities having the same ownership.

34. That employees of REJ were really employees of WMT, an unincorporated business partnership.

35. REJ had no franchise agreement with Ameriprise, rather with the individuals Walters, Meyer and Trosclair.

36. Badgerow's salary was paid solely from REJ but she performed services for WMT.

37. That REJ never issued any dividends.

38. REJ was administratively terminated in May of 2017 by the Louisiana Secretary of State shortly after Badgerow instituted litigation.

39. Adherence to the fiction of a separate corporate existence of REJ would sanction a fraud or promote injustice.

40. REJ Properties Inc. was not registered as a Broker-Dealer with the Securities and Exchange Commission (SEC) or with the Financial Industry Regulatory Authority (FINRA).

41. REJ was used to avoid the oversight and regulation of the financial services industry, including the SEC, FINRA and the Louisiana Office of Financial Institutions (LOFI).

42. Accordingly, this Court should pierce the corporate veil and hold Walters, Meyer and Trosclair liable for REJ's obligations.

43. REJ failed to provide Denise Badgerow with a written compensation agreement, as required of all Broker-Dealer.

44. Plaintiff, Badgerow, was hired to work for REJ directly upon graduating from Nicholls State University with a Bachelor of Arts in finance pursuant to an Agreement with written agreement REJ Properties, Inc. Badgerow was designated as a "Paraplanner" for a 90-day probationary period. Later, Badgerow was promoted to an Associate Financial Advisor (AFA) on or about January 1, 2014, after passing all of her necessary financial

regulatory exams to become an AFA, including the Series 7 and the Louisiana insurance exam. Her work as an AFA was supervised directly by Gregory Walters ("Walters"), one of three partners of WMT and a fifty percent shareholder of REJ Properties, Inc.

45. The agreement between Badgerow and REJ when she was initially hired is that after two (2) years of exemplary employment in the AFA role at REJ, REJ policy dictated that she would be promoted to a "Financial Advisor" (FA).

46. After the probationary period ended, Badgerow was promoted to an AFA with a verbal agreement that she would receive compensation of $30,000/year in base salary plus additional commission of 20%-40% of Gross Dealer Compensation, depending on her total sales balance for the year, which would reset on January 1 each year.

47. Badgerow was never provided a written compensation agreement.

48. In October of 2014, Badgerow made a large commissioned sale that resulted in a Gross Dealer Compensation commission of approximately $50,000.

49. Only after the sale was she was informed by Kylie Kern (the WMT Office Manager), that REJ would use an annual salary draw compensation method, which draw would retroactively negate all of her prior base salary earning for the year.

50. Badgerow believed that this compensation structure was how all AFAs at WMT were paid, but later discovered she was the only employee that was subject to an annual salary draw and was not receiving a base salary.

51. Essentially, instead of earning a base salary plus commissions, as was originally agreed, Badgerow would retroactively be given an annual salary draw of $30,000, plus commission.

52. This new unwritten policy and unwritten compensation agreement cancelled out any

benefit Badgerow received from her first large commission sale, in breach of REJ's verbal compensation agreement with Badgerow to pay her a guaranteed base salary.

53. From this point forward Badgerow was paid on the basis of an annual salary-draw as opposed to a base salary plus commission.

54. In addition, REJ held back two months of Base Salary in "Bank" in the event a commissioned sale was ever clawed back.

55. No other REJ employees were required to provide a "Bank" to cover their future draws.

56. The REJ pay policy of AFAs receiving an annual salary- draw compensation structure was selectively adopted and enforced only against Badgerow and not other similarly situated male AFAs.

57. Evan Weibel, an AFA hired shortly before Badgerow was given a written compensation agreement that shows he earned an hourly salary plus commissions.

58. The similarly situated male AFAs that were hired subsequently to Badgerow were all paid on the basis of a salary draw calculated on a per pay period basis, as opposed to an annual pay period basis.

59. After months into her new career, Walters offered Badgerow the opportunity to change roles from a client-facing AFA to an assistant to Walters. Assistants are equally credentialed AFAs who work solely on another's book of business, and do not develop a portfolio of their own. Badgerow adamantly refused Walters' suggestion. Badgerow was determined to grow her own portfolio and book of business, not work as an assistant to Walter.

60. Upon information and belief, other than Badgerow, WMT has never employed a female client-facing AFA or FA. All of these positions have been filled by men. In fact, all of the competent female AFAs act as non-client facing assistants to male FAs at WMT.

61. About the time Badgerow refused to become an Assistant to Walters, the office harassment began. Badgerow was told by Walters that Tommy Meyer, another Director at REJ and a partner in WMT did not like her. When Badgerow asked Walters why Meyer did not like her, Walters stated, "I don't know – did you rebuff his sexual advances or turn him down for a date?" After assuring Walters that nothing like that had ever happened, Walters responded to Badgerow, that it could be that he is just a misogynist.

62. Over the next year, Badgerow was subjected to constant harassment and ridicule by Meyer and his team, including Kylie Kern, Lynna Marcel, and other team members who worked under Meyer.

63. Untrue and salacious rumors began circulating around the office that Badgerow was sleeping with Walters, which eroded her reputation and caused animosity with the other females in the office.

64. The rumors prompted Trosclair to ask Badgerow if she was sleeping with Walters.

65. Similar rumors were circulated about another female employee, Meghan Frost, who was also seeking to become a client-facing AFA, causing her to quit.

66. The harassment and embarrassment was so severe Badgerow sought medical attention for depression, stress and anxiety.

67. Badgerow was placed on anxiety medication.

68. In 2015, Badgerow inquired to Walters as to why she was not receiving her compensation from Employshare, a third-party provider that paid all the other male FAs except for Badgerow.

69. Walters responded that Employshare was too expensive to use, and asked Badgerow to research other Ameriprise approved payroll providers.

70. After speaking with Paychex, Badgerow told Walters that the method of paying her

through REJ was not "compliant," and she needed to be paid directly through a third-party payroll provider to be compliant.

71. Walters knew that "compliant" meant complying with the law.

72. On or about January 20, 2016, after the end of her two-year period and a rock-star record of performance as an AFA, Walters informed Badgerow that she was promoted to the role of FA. On February 20, 2016, Meyer sent Badgerow and Kylie Kern an email stating: "I have made a decision that all associate financial advisors will maintain the title of Associate, as opposed to financial advisor, until they have completed five years of service with WMTA" a new unwritten company policy was being adopted against long standing company policy, and Badgerow would be demoted and remain an AFA at REJ.

73. All the Financial Advisors at REJ earned a base salary of compensation.

74. In 2015, Badgerow became aware that even though she was a top producing AFA, she was earning quarterly bonuses which were half the amount of her male counterparts. When questioned about the bonus differential by Badgerow, Walters blamed the difference in bonus pay on Meyer with no further explanation, and hand wrote a payroll check to Badgerow to cover the $400 difference to "make it right".

75. After complaining constantly to Walters about the hostile work environment and other discrimination, on Thursday May 26, 2016, Badgerow met with Walters at his home, where they discussed a new employment arrangement, whereby Badgerow would be removed from Walters, Meyer, Trosclair & Associates and begin work as a 1099 employee with Walters, earning a 70% payout on Badgerow's current and future clients.

76. On June 14, 2016, Walters announced the agreement between Badgerow and himself to his other partners at WMT, Meyers and Trosclair.

77. Shortly thereafter Badgerow moved into a new office in Houma, Louisiana rented by

REJ Properties, Inc and began furnishing the office under her agreement with Walters. However, the paperwork to change Badgerow to a 1099 employee was never completed and she continued to receive her commissions through REJ.

78. On July 13, 2016, Badgerow spoke with Marc Cohen, a compliance officer of Ameriprise. Badgerow expressed many of her concerns to Marc Cohen, including that she was not being paid compliantly and that she was being treated differently either because she was a female or because she was not a family member.

79. Badgerow is required to have annual compliance calls with an Ameriprise Compliance Officer pursuant to the terms of her agreement with Ameriprise and is required to report any compliance issues.

80. Badgerow told Marc Cohen that REJ Properties was paying her commissions and sent him a copy of her paystub.

81. On the morning of July 26, 2016, Marc Cohen placed calls to Walters and Meyer, separately, to discuss his conversation with Badgerow. Mr. Cohen asked both men about the compliance issues and Meyer stated that he would fix the payroll issue immediately. During his conversation with Walters, Mr. Cohen informed him that Badgerow "*said she was not sure if she was not treated fairly because she was not family or because she is a woman*."

82. Badgerow was called into the main office of REJ on July 26, 2016 to meet with Walters. At this meeting Walters asked Badgerow to resign her position four or five times because "her statement to Marc Cohen dinged [Walters'] perfect compliance record".

83. Before leaving, Walters reminded Badgerow that she was subject to a nonsolicitation agreement was not allowed to call clients.

84. After refusing to resign from REJ, Badgerow was terminated. She signed a prepared

letter that Walters provided to her stating that she was terminated but was not provided a copy.

85. Ameriprise terminated Badgerow's registration on July 27, 2016, which termination prohibited Badgerow from speaking to her clients until such time as she was re-registered with another Broker-Dealer.

86. It took Badgerow over three months before she was registered with Capital One and before could solicit or even speak with her clients.

87. Ameriprise included a nonsolicitation provision in its agreement with Badgerow, which agreement prohibits Badgerow from soliciting clients for 365 days after her termination with Ameriprise.

88. When Badgerow called Ameriprise to determine if they would enforce the provision, Ameriprise said that decision was up to WMT.

89. Neither Ameriprise or any of the Defendants repudiated the nonsolicitation provision contained in Ameriprise's Agreement.

## FIRST CAUSE OF ACTION
### Intentional Discrimination – Hostile Work Environment
### Title VII (On behalf of Badgerow)

90. Badgerow incorporates by reference each and every allegation in the preceding paragraphs.

91. Since at least January 1, 2014, REJ and WMT have engaged in unlawful and discriminatory employment practices in violation of 42 U.S.C. § 2000e *et seq.*, including subjecting Badgerow to a hostile work environment based on her gender.

92. REJ and WMT created and perpetuated a hostile work environment against Badgerow based on her gender.

93. Meyer, sent harassing group Skype messages, GroupMe messages and texts and encouraged other employees to bully and exclude Badgerow at every opportunity, allowing

an environment of disrespect to flourish.

94. Meyer refused to promote Badgerow to a Financial Advisor after two years of exemplary service, although the prior policy of the office had been that AFAs who worked at REJ for two years would be promoted.

95. This failure to promote resulted in Badgerow not receiving a Base Salary, as all other male Financial Advisors who worked at REJ received an annual base salary plus commissions.

96. REJ's conduct was offensive, severe, unwelcome and pervasive and interfered with her working conditions and Badgerow's terms of her employment.

97. Badgerow sought medical treatment to cope with the anxiety, stress and depression she suffered as a result of the hostile work environment.

98. The hostile work environment occurred with the full knowledge of REJ, WMT, Walters, Meyer and Trosclair, and REJ failed to exercise reasonable care either to prevent this hostile work environment or to correct promptly the hostile work environment once it existed.

99. Neither REJ or WMT maintained discrimination policies, other than adopting the Code of Conduct of Ameriprise, which Code is inapplicable to Franchise employees.

100. REJ's conduct was intentional, and done with malice or with reckless indifference to the federally protected rights of Badgerow.

**SECOND CAUSE OF ACTION**
**Intentional Discrimination – Hostile Work Environment**
**LEDL (On Behalf of Badgerow)**

101. Badgerow incorporates by reference each and every allegation in the preceding paragraphs.

102. REJ and WMT have violated La. R.S. 23:301 *et seq*. ("LEDL"). by intentionally discriminating against Badgerow with regard to the terms and conditions and privileges of her employment because of her gender. Specifically, REJ's refusal to accord Badgerow the same privileges accorded to male employees violated LEDL. In addition to the remedies set forth in

Title VII, Badgerow requests that she be awarded all available relief under the laws of the State of Louisiana.

### THIRD CAUSE OF ACTION
### Discrimination – Disparate Treatment
### Title VII (On behalf of Badgerow and Class)

103. Badgerow incorporates by reference each and every allegation in the preceding paragraphs.

104. REJ engaged in a company-wide, and systematic policy, pattern, and/or practice of discrimination against Plaintiffs on account of their gender, by:

- Refusing to allow females to join males on business development trips such as luxury hunting or fishing trips;
- Denying Plaintiffs the advantage of updated marketing materials after completion of significant career milestones. For example, Badgerow's designation of CRPC was never added to her marketing materials, yet other, male, AFAs were given updated materials and billboards announcing their advancements immediately;
- Utilizing a biased compensation system;
- Utilizing a biased promotion system;
- Requiring female AFAs to punch a timeclock, while male AFAs were not required to punch in; and
- Discouraging female AFAs from becoming client-facing.
- Starting salacious rumors about female AFAs seeking to become client-facing

105. These policies are intended to and do have the effect of:

- Denying Plaintiffs business opportunities because of their gender;

- Compensating Plaintiffs less because of their gender;

- Failing to promote Plaintiffs because of their gender;

- Evaluating Plaintiffs' performance more negatively because of their gender;

- Creating an unbearable hostile work environment; and

- Providing Plaintiffs with inferior terms and conditions of employment as a result of discriminatory performance measures that systematically disadvantaged them because of their gender.

**FOURTH CAUSE OF ACTION**
**Disparate Pay**
**Equal Pay Act (On behalf of Badgerow)**

106. Badgerow incorporates by reference each and every allegation in the preceding paragraphs.

107. REJ paid different wages, including base salary and bonuses, to Badgerow as compared with her male counterparts at REJ, even though Badgerow performed equal work on jobs requiring equal skill and responsibility and the jobs of these employees were performed under similar working conditions.

108. Badgerow was the only Associate Financial Advisor that was paid on the basis of an annual salary draw. A similarly situated male employee were paid either a full base salary or were paid on the basis of a pay period salary draw, as opposed to an annual salary draw.

**FIFTH CAUSE OF ACTION**
**Disparate Pay**
**LEDL (On behalf of Badgerow)**

109. Badgerow incorporates by reference each and every allegation in the preceding paragraphs.

110. REJ's conduct alleged in the preceding paragraphs further violate La. R.S. 23:301 *et*

*seq.*, and in addition to the remedies set forth in the Equal Pay Act, Badgerow requests that she be awarded all available relief under the laws of the State of Louisiana.

## SIXTH CAUSE OF ACTION
### Retaliation
### Title VII (On behalf of Badgerow)

111. Badgerow incorporates by reference each and every allegation in the preceding paragraphs.

112. On or about July 26, 2016, in the state of Louisiana, REJ engaged in unlawful retaliation in violation of Section 703(a) and 704(a) of Title VII, 42 U.S.C. § 2000e- 2(a) and § 2000e-3(a) by terminating Badgerow on the same day that Marc Cohen reported Badgerow's complaints to Walters and Meyer, and after she had previously on numerous occasions reported the discrimination and hostile work environment to her supervisor, Walters.

## SEVENTH CAUSE OF ACTION
### Retaliation
### LEDL (On behalf of Badgerow)

113. Badgerow incorporates by reference each and every allegation in preceeding paragraphs as though fully set forth herein.

114. Badgerow has been retaliated against by being terminated in response to her reporting of unfair treatment to Walters, her direct supervisor at REJ, Michael Barker, and Marc Cohen of Ameriprise, WMT's Franchisor, in violation of the LEDL.

## EIGHTH CAUSE OF ACTION
### Whistleblower (On behalf of Badgerow)

115. Badgerow incorporates by reference each and every allegation in the preceding paragraphs.

116. REJ fired Denise Badgerow after first complaining to Walters and then complaining to Ameriprise that she was being paid using an illegal and noncompliant

payment scheme, whereby she was receiving her compensation directly from REJ.

117. WMT's method of combining its GDC compensation to then fund REJ Properties, Inc. for payment to Denise Badgerow violates Securities and Exchange Commission Rule SEA 15 (a), FINRA Rule 2040, and Louisiana Administrative Code 10:XII.1201 and 1203 and La. R.S. 51:723, which requires all entities receiving commission from the sale of securities to be registered as a broker-dealer, or meeting an exception to registration. REJ does not meet any exceptions to registration, but failed to register.

118. Denise refused to participate in the unlawful payment scheme by telling Marc Cohen of the compliance violation and was terminated in retaliation for such protected activity.

## NINTH CAUSE OF ACTION
### Louisiana Unfair Trade Practices Act

119. Badgerow incorporates by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

120. REJ and WMT has responsible for using unfair or deceptive methods, acts, and practices in their business and these unfair or deceptive methods have caused Badgerow significant damages, including the loss of her book of business that she built at REJ properties for two and a half years. REJ's failure to registered as a Broker-Dealer is an unfair trade practice for a financial services business and such fraud was used as a means to avoid the legal and regulatory oversight of FINRA, the SEC and the Louisiana Office of Financial Institutions. By failing to properly register as a Broker Dealer, REJ avoided the record keeping requirements of Broker Dealers, including the requirement of maintaining a written compensation agreement for Badgerow that reflected how her commissions were to be paid. REJ should be disgorged of all profits that REJ enjoyed as a result of its unlawful and deceptive trade practice.

# ELEVENTH CAUSE OF ACTION
## Breach of Contract
### (On behalf of Badgerow)

121. Badgerow incorporates by reference each and every allegation in the preceding paragraphs.

122. REJ breached its contracts with Badgerow by failing to compensate her as originally agreed, in violation of Article 1994 of the Louisiana Civil Code.

123. REJ breached its employment agreement with Badgerow by terminating her and taking the 70% revenue split from her book of business that she was entitled to under such agreement.

## DEMAND FOR JURY

124. Plaintiffs hereby demand a trial by jury for all issues in this case.

## PRAYER FOR RELIEF

**WHEREFORE**, having set forth her Complaint, Badgerow, on behalf of herself and the Class, respectfully requests that they be awarded all available relief including, but not limited to, entering a judicial order piercing the corporate veil as necessary to hold REJ and Defendants responsible for the actions of REJ Properties actions described herein, issuing a declaratory judgment that the acts and practices of REJ and WMT complained of herein are in violation of the laws of the United States and Louisiana, a finding injunctive relief, an award of lost commission wages, including lost fringe benefits, which resulted from the unlawful discrimination and retaliation complained of herein, reinstatement or front pay in lieu thereof, compensatory and punitive damages, liquidated damages, and damages for mental anguish, pain, suffering, public embarrassment and humiliation, any other damages that may be proven at trial, pre-judgment and post-judgment interest, attorneys fees, expenses, and costs, and all other and further relief as to this Court appears necessary and proper.

Respectfully Submitted:

**BUSINESS LAW GROUP, LLC**

By: <u>s/Stephanie Dovalina</u>
Stephanie Dovalina
(LSBA #31137.)
Amanda Butler
LSBA # 31644
abutler@lawgroup.biz
Business Law Group
700 Camp St., Ste. 405
New Orleans, LA 70130
Telephone: (504) 528-9500
Facsimile: (504) 754-7776

Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2019, a copy of the above and foregoing has been served upon counsel for all parties by electronic means and filed electronically with the Clerk of Court using the CM/ECF system.

**/s/ Stephanie Dovalina**

Stephanie Dovalina, Esq.
Business Law Group

4826-4532-6213, v. 1