UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DENISE A. BADGEROW,** | * | **CIVIL ACTION NO.: 2:17-CV-9492** |
| **on behalf of herself and a class of** | * | |
| **those similarly situated,** | * | **JUDGE:  JAY C. ZAINEY** |
| **Plaintiffs,** | * | |
| **v.** | * | **MAGISTRATE: JOSEPH C.** |
| | * | **WILKINSON, JR.** |
| **REJ PROPERTIES, INC. D/B/A WALTERS,** | * | |
| **MEYER TROSCLAIR & ASSOCIATES,** | * | |
| **AND** | * | **SECTION: A/2** |
| **AMERIPRISE FINANCIAL SERVICES,** | * | |
| **INC.** | * | |
| | * | |
| ****************************************** | * | ****************************************** |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT REJ PROPERTIES, INC.'S MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT,** through the undersigned counsel, comes Plaintiff, Denise Badgerow, who respectfully files this Memorandum in Opposition to Defendant REJ Properties, Inc. ("REJ"), requesting that this Honorable Court deny the Defendant's Motion because there are material issues of disputed facts in this matter and the motion is premature as discovery is ongoing. REJ has yet to provide responses to timely served discovery and has just filed a motion to quash the discovery served. Several of the issues in dispute will be addressed during the 30(b)(6) Corporate Deposition of REJ, which was ordered by Judge Wilkinson on February 11, 2019, to be set among the parties following his ruling on Plaintiff's Motion to Amend Complaint.

## SUMMARY OF ARGUMENT

Based upon the new allegations contained in Plaintiff's Amended and Supplement Complaint filed with the Court today, particularly considering the facts discovered during Walter

and Meyer's deposition and the FINRA testimony of Ray Troclair, the Defendant's entire Motion for summary judgement is premised on the incorrect assertion that Walters, Meyer and Trosclair & Associates is the same as REJ Properties, Inc.  As the testimony of Walters, Meyer and Trosclair showed in their depositions and as briefed in our Memorandum in Support of Our Motion to Supplement and Amend Plaintiff's Complaint (R. Doc. 125), Defendant's motion should be denied as it subverts the true nature of REJ Properties, Inc.

## **RELEVANT FACTUAL BACKGROUND**

Shortly after Denise Badgerow started as in her role as a client-facing associate financial advisor (AFA) at WMT and after refusing Greg Walters' suggestion to become his non-client facing assistant, Badgerow began to experience significant work place harassment.[1]  Badgerow was told a couple of times that [they] would prefer her to be Greg's assistant as opposed to being client-facing.[2]  Badgerow felt that being an assistant to Greg was a demotion because the whole reason she chose to work at WMT was to be a client-facing financial advisor, not to be coaxed into being an assistant.[3]  In her deposition, Badgerow describes this, as follows:

A.  There was no sexual aggression towards me.

Q.  Just you were, use your words, bullied.

A.  Yes.  But the hostile work environment was strictly based on the fact that I was a female advisor, and I have no idea why they didn't like me.[4]

…

Q.  And you believe that you were harassed.

A.  Yes, I do.

Q.  Who specifically harassed you?

---

[1] See Badgerow Deposition, attached hereto as Exhibit 1 at p.152:2-21.
[2] Exhibit 1 p. 151:18-152:1.
[3] Exhibit 1 p. 152:5
[4] Exhibit 1 p. 218:17-21

A.  It was led by Thomas Meyer and then the others followed suit.

Q.  And Thomas Meyer was the leader of the office, correct?

A. Yes.

Q.  …When you asked Greg Walters why Thomas Meyer didn't like you, what did Greg say?

A.  He specifically said, "I don't know."[5]

…

Q.  So there was no reason given why Tommy didn't like you.

A.  That's correct.

Q.  And the speculation by Greg Walters was that what?

A.  He did not want a female in this position as a financial advisor.[6]

Denise complained to Greg Walters often about the harassment and the bullying from Meyer that she perceived as being baseless in person and in a number of text messages.[7]  Instead of addressing the harassment by Meyer and his team, Greg counseled Denise on her demeanor with the other employees telling Denise to keep her head down, keep working and stay out of everyone's way.[8]  Badgerow received glowing praise from Walters weekly about her performance and her numbers.[9]  During this same period, Badgerow was asked by Kristin Parish, a non-client facing associate financial advisor, if she was having an affair with Greg Walters.[10]  When asked why Kristin thought Denise was having an affair with Greg Walters, she responded that she thought Denise was receiving special treatment.[11]  The rumor regarding the affair with Greg Walters affected Denise's credibility at the office.[12]  Undoubtedly the rumors created significant animosity between Badgerow and the other non-client facing female employees at WMT.

---

[5] Exhibit 1 p. 246:1-5.
[6] Exhibit 1 p. 249:2-10.
[7] WMTA 000200-000209, attached hereto as Exhibit 2.
[8] FINRA Tr. 8/27/18 p. 124:23-25 and p.125:1-4, attached as Exhibit 3.
[9] Exhibit 3, at p. 124:12-15.
[10] Exhibit 3 at 125:10-23
[11] Exhibit 3 at 125:16-17
[12] Exhibit 3 at 126:6-7.

Shortly after marking two years at WMT, and in accordance with the current WMT policy, Walters promoted Badgerow to the title of "Financial Advisor."[13]  On Saturday, February 20, 2016, Thomas Meyer sent an email to Denise Badgerow and Kylie Kern reversing the promotion, which simply states, "*I have made the decision that all associate financial advisors will maintain the title of Associate, as opposed to Financial Advisor, until they completed five years of service at WMT[A].*"[14]

At the height of the harassment from Meyer and his team, Denise texted Greg, "For the first time in my life, I can finally understand how a person can end their life from the pressure of bullying."[15]  Greg's response to Denise was "Don't talk stupid and don't let him win. (him being Thomas Meyer)"[16]

At her breaking point, Greg Walters proposed a solution to the hostile work environment in an email to his partners, whereby he would move Denise to another office and have her become a 1099 employee.[17]  Denise agreed to this compromise because it was "a relief".[18]  A relief from the harassment of the office in Houma.  When asked about the solution to move Denise into the new office, Walters stated in his deposition, "*This was a solution that Denise and I came up with to give her a better opportunity to grow her practice.*"

Q.  And so that she could escape the harassment that she was experiencing?
A. To get all the parties away from each other and reduce stress in my life."

---

[13] Exhibit 1 p. 136:1-18.
[14] See WMTA 00462-00463, attached as Exhibit 4.
[15] Exhibit 3 p.132:1-3.
[16] Exhibit 3 p. 132: 5-6
[17] WMTA 000001-0000005, attached as Exhibit 5.
[18] Exhibit 3 p. 190:5.

At the direction of Walters, and acting on the agreement between her and Walters, Badgerow leased on office in the name of REJ Properties, Inc in Houma.[19]  She purchased office supplies and a computer.[20]  But Walters could not get Meyer and Trosclair to agree to the new arrangement.[21]  Badgerow was terminated in July of 2016, 13 days after having a compliance call with Marc Cohen, her Ameriprise compliance officer in which she told Marc Cohen about the disparate treatment.[22]

On the same day that he received the phone call from Cohen telling him to hire a labor attorney because of Denise's conversation with him, Walters fired Badgerow telling her that she "had dinged his perfect compliance record".[23]  He reminded her that she was subject to a non-solicitation agreement and that she'd better not contact her clients.[24]

## LAW AND ARGUMENT

There are material issues of fact in dispute which warrant denial of Defendant's Motion for Summary Judgment.

**A. The Determination of whether REJ is a covered employee by the LEDL is a mixed issue of law and fact that requires the trier of fact to determine**

REJ asks this Court to dismiss Badgerow's claims under the Louisiana Employment Discrimination Law ("LEDL") arguing that REJ is not a covered employer under the statute but fails to address WMT. The LEDL is codified as La. Rev. Stat 23:301 *et. seq*. The statute defines an employer as:

---

[19] Exhibit 3 p. 192:11-13
[20] Exhibit 3 p. 192:1-7
[21] *Id.*
[22] See REJ Exhibit B-27.
[23] Exhibit 3 p. 141-142.
[24] Exhibit 3 p. 143:14-16.

a person, association, legal or commercial entity, the state, or any state agency, board, commission, or political subdivision of the state receiving services from an employee and, in return, giving compensation of any kind to an employee. The provisions of this Chapter shall apply only to an employer who employs twenty or more employees within the state for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.[25]

An employee is defined as "an individual employed by an employer."[26]

REJ submitted a self-serving affidavit from Kylie Kern, the former Office Manager for the "financial advising firm Walters, Meyer, Trosclair & Associates ("WMT")" in support of this contention.[27] Kern states that as office manager for WMT, she was responsible for calculating payroll based on the compensation decisions made between the employees and partners of WMT, not REJ. Kern also states that she reviewed REJ's payroll records for 2013 to 2016 and confirmed that WMT employed between 14 and 19 employees during each week in the calendar years 2013, 2014, 2015, 2016 and that WMT always had less than twenty employees from January 1, 2013 to December 31, 2016.[28] Kern fails to identify or provide the documents that she reviewed to form her opinion as to how many employees REJ had from 2013 to 2016. Kern provides her opinion on how many employees REJ had from 2013 to 2016, but is not identified as holding any position with REJ, she is merely identified as the office manager for WMT, not REJ. She is not identified as an expert witness, nor does she provide any explanation concerning the manner in which she calculated the number of employees.  REJ claims in its Motion that it is not subject to the LEDL because it did not have twenty employees as defined by the LEDL and the only evidence submitted in support of this argument is Kern's affidavit. Moreover, Kern's affidavit doesn't state that she calculated the number of employees in accordance with the LEDL definition of employer.

---

[25] La. R.S. §23:302 (2).
[26] La. R.S. §23:302 (1).
[27] See REJ Exhibit G.
[28] REJ Exhibit G at ¶ 10.

In early 2019, REJ provided payroll records to Plaintiff from January 1, 2013 through August 28, 2016. No financial records of were provided for the partnership, Walters, Meyer, Trosclair & Associates, or its partners Walters, Meyer and Trosclair.  The records evidence that the following individuals received wages from REJ from 2013 to 2016: 1) Amy Hebert; 2) Andrew C. Walters; 3) David Ponson; 4) Demitria L. Perry; 5) Dru Pierce; 6) Elizabeth Hornsby; 7) Evan Weibel; 8) Kristin Parrish; 9) Kylie Kern; 10) Lloyd Kern; 11) Lynna Marcel; 12) Toni E. Troxclair; 13) John T. Meyer; 14) Lesley Meyer; 15) Pam Walter; 16) Denise Badgerow; 17) Nathan C. Walters; 18) Emily L. Fazzio; 19) Andrew C. Walters; 20) Christopher Callahan; 21) Brooke Crochet; 22) Victoria Ordoyne; 23) Megan B. Frost; 24) Natalie C. Daigle; and 25) Jordan R. Trosclair.[29] The records provided, however, are inconsistent. The records list the individuals paid by REJ Properties, Inc., however, there are several inconsistencies in the records. For example, there are instances where some but not all individuals receive overlapping and additional paychecks. Additionally, there are several instances where the record of payment to an individual for a certain pay period is included in the wrong pay period. Due to the inconsistencies Plaintiff will need to examine the records with Ms. Kern in her deposition. It is unclear who created the payroll records, if they were generated from software or compiled by an individual from other documents and records.

The issue concerning the number of REJ employees is further complicated by Kern's affidavit because she conflates WMT with REJ. Each entity, REJ and WMT have separate partners, members, officers, directors, and were formed to accomplish different purposes. WMT provided financial advisory services, while REJ was a real estate holding company that provided payroll services for some employees that provided services in furtherance of WMT's purpose. Meyer

---

[29] REJ Payroll records WMTA 1212 -1242, attached hereto as Exhibit 6.

testified that REJ was a real estate holding company that he bought into.[30] The original REJ By Laws were never amended and show only Greg Walters and Mitchell Chiasson as officers of the corporation.[31] REJ later changed from acting solely as a real estate company to employing some individuals for WMT.[32] Badgerow provided services to WMT, who was paid by Ameriprise. Ameriprise made payments to the registered individuals Greg Walters, Thomas Meyer and Ray Trosclair, and then those individuals collectively pooled the money that came into their individual bank accounts into REJ Properties Inc., who then issued wages and commission to Badgerow, other AFAs, and support staff and paid other expenses.

Walters testified that REJ paid Badgerow's wages because Ameriprise will only pay GDC directly to the financial adviser.[33] Instead of Walters, Meyer, and Trosclair each writing a check to contribute to each employee's salary, they pooled the money into REJ, because it already existed.[34] Walters also testified that he was a half owner and producer of REJ.[35]

Plaintiff believed that WMT and REJ were the same entity.[36] REJ was not in the business of providing financial services, that was the purpose of WMT. WMT was an unregistered partnership. Accordingly, REJ and WMT are really a collective enterprise or joint employer that employed Badgerow.   Although REJ claims that it never employed more than nineteen people, an issue of material fact exists as to whether any of the principles of WMT employed other persons in exchange for services related to the business of WMT.

Furthermore, the payroll records provided do not include any payments to the three principals at WMT, Walter, Meyer, or Trosclair but Trosclair is not an officer or director of REJ,

---

[30] Meyer Deposition at p. 21:2-8, attached hereto as Exhibit 7.
[31] Exhibit 7 at 21:20-22:6.
[32] Exhibit 7 at p. 23:2-6.
[33] Walters Deposition at p.24:16-21, attached hereto as Exhibit 8.
[34] Exhibit 8, p. 24:21-25:4.
[35] Exhibit 8, p. 23:17-19
[36] Exhibit 1 at p. 31:14-17.

the only officers were Walters and Meyer.[37] Accordingly, Trosclair should be considered an employee as well. In *Clackamas Gastroenterology Associates v. Wells*, the Supreme Court articulated a common law test to determine whether an owner can be considered an employee.[38] The Court indicated that its method to determine an employee's status is not guided by the title of the individual or the employment agreement, but by common law principles which may be applied to partners, officers, directors and shareholders of the employer.

In *Clackamas*, Deborah Wells filed suit alleging that Clackamas violated the ADA when it terminated her employment. Clackamas moved for summary judgment, asserting that it was not covered by the Act because it did not have 15 or more employees for the 20 weeks required by the ADA. The assertion's accuracy was dependent on whether the four physician-shareholders who owned the professional corporation and constituted its board of directors were counted as employees. The Court adopted the EEOC's guidelines to determine who is an employee. The Court held that the following six factors are relevant to the inquiry whether a shareholder-director is an employee:

1. Whether the organization can hire or fire the individual or set the rules and regulations of the individual's work.

2. Whether and, if so, to what extent the organization supervises the individual's work.

3. Whether the individual reports to someone higher in the organization.

4. Whether and, if so, to what extent the individual is able to influence the organization.

5. Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts.

---

[37] See Louisiana Secretary of State Certificate for REJ Properties Inc. attached hereto as Exhibit 9.
[38] 538 U.S. 440 (2003).

6.   Whether the individual shares in the profits, losses, and liabilities of the organization.[39]

This Court denied Defendant's Motion to Quash the depositions of Kylie Kern, Ray Trosclair and REJ Properties, noting that obtaining the testimony of two individual witnesses and the representative of the corporate defendant is not duplicative of previously issued interrogatories and/or requests for production.[40] These depositions are necessary to establish whether any of the principals of WMT employed anyone outside of REJ and whether Ray Trosclair is an employee based on the fact that he has no ownership in REJ Properties Inc, thereby having no ability to influence the organization, no share in the liabilities and losses of REJ.  Further deposition testimony and production of financial records of the partners of Walters, Meyer, Trosclair & Associates is needed to establish these facts critical to making a determination of whether Walters, Meyer, Trosclair & Associates, together with REJ Properties, Inc., is a covered employer under the LEDL.

**B. Plaintiff Has Met Her Burden of Proving a Prima Facie Case for her Title VII Gener Discrimination Claims including: hostile work environment, pattern and practice and retaliation.**

REJ argues that Badgerow only brings claims for Title VII sex discrimination under the pattern or practice method of proof alone, rather than through the single plaintiff burden shifting approach under McDonnel Douglas.  REJ claims that Fed R. Civ. Pro 8(a)(2) requires a strict application pleading standard and therefore, if summary judgment is entered to REJ's favor on Badgerow's class claims there is no individual discrimination claim for her to pursue.

Federal Rule of Civil Procedure 8 provides as follows in pertinent part:

Rule 8. General Rules of Pleading

(a) Claim for Relief. A pleading that states a claim for relief must contain:

---

[39] *Id*.
[40] R. Doc. 104.

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.
> ...

(e) Construing Pleadings. Pleadings must be construed so as to do justice.

Defendant fails to cite to any law supporting its contention that Rule 8 requires a strict application. Furthermore, there is ample information in Badgerow's Complaint to establish her individual claims of gender discrimination under Title VII through a pattern and practice. In paragraph three of her Complaint Badgerow states "In addition to bringing this action on behalf of herself, Badgerow also brings this action on behalf of a class of similarly situated current and former female AFAs employed by WMT in the United States (the "Class" sometimes collectively with Badgerow referred to as "Plaintiffs") in order to end WMT's discriminatory policies and practices and to make the Class whole. In paragraph nine, Badgerow states "This action is brought to remedy discrimination on the basis of sex, hostile work environment and disparate treatment in the terms, conditions, and privileges of employment for Plaintiffs and to remedy the retaliation against Badgerow for engage in activity protected under Title VII. The title of the Third Cause of Action is "Third Cause of Action Discrimination – Disparate Treatment Title VII (on behalf of Badgerow and Class)." In addition, Badgerow incorporates each and every factual allegation into her third cause of action entitled "Discrimination – Disparate Treatment".  See Paragraph number 41.

REJ also argues that Badgerow has not alleged any discriminatory employment actions by REJ *specifically toward her*.[41] The Complaint includes multiple allegations of discriminatory employment actions specifically toward Badgerow. Paragraph 42, on page ten outlines some of the discriminatory practices for the class claims, which include Badgerow. In addition to the allegations for the class discriminatory actions, Badgerow also provides examples of discrimination toward herself, such as "Badgerow's designation of CRPC was never added to her marketing materials, yet other, male, AFAs were given updated materials and billboards announcing their advancement immediately." REJ's argument that Badgerow has not pled facts sufficient to support a cause of action for an individual discrimination claim is misplaced and without merit.

### 1. Evidence of Pattern and Practice of Gender Discrimination

WMT had a pattern and practice of discriminating against females by rarely hiring female client-facing associate financial advisors, in fact Badgerow was the only female client-facing associate financial advisor ever employed by WMT. From 2013 – 2016, Badgerow was the only female client-facing financial advisor in an office of eight AFAs. The percentage of female client-facing advisors was 12.5% women to 87.5% men. However, all the other support roles in the office are females and every assistant to a male financial advisor is female, including Kylie Kern, Lynna Marcel and Kristin Parish.[42]

#### a. Failure to Update Marketing Materials

Kylie Kern, who has yet to be deposed, states in a self-serving affidavit that WMT had a policy of updating marketing materials based on budgetary concerns. Contrary to this assertion, Badgerow complains that her designation of CRPC was never added to her marketing materials,

---

[41] See REJ MSJ at p. 11.
[42] See Complaint at Paragraph 19

yet other, male, AFAs were given updated materials and billboards announcing their advancement immediately.[43]   A material issue of fact exists as to whether Kern's assertion is true and what evidence supports such assertion.  Kern must be deposed.

**b. Direct Evidence of Walters Excluding Badgerow From Certain Overnight Client Development Trips**

Badgerow was excluded from marketing events that were "male-oriented" like fishing and hunting trips and was told directly by Greg Walters that it would be inappropriate for her, as a female, to attend overnight trips with men.[44]  Instead WMT sent and paid for Denise Badgerow to attend a Women's Empowerment Conference.   But attending the Women's Empowerment Conference with other FAs and AFAs does not provide the same type of marketing environment and client development opportunities as a weekend hunting or fishing trip with clients would.

2. Badgerow was Subject to a Hostile Work Environment

A hostile work environment occurs when unwelcome conduct unreasonably interferes with an employee's work performance or creates an intimidating work environment regardless of whether the conduct is directly tied to a job benefit or detriment. Hostile work environment (HWE) harassment applies to all forms of unlawful harassment, not just sexual harassment. This means that harassment based on any protected class can be HWE harassment. In order to establish a prima facie case of a hostile work environment, an employee must show that:

1.      She belongs to a protected group;

2.      she was subject to unwelcome harassment;

3.      The harassment was based on her membership in a protected group;

---

[43] Complaint at ¶ 43.
[44] Exhibit 1, p. 133:16-20

4.      The harassment was sufficiently pervasive to affect a term, condition, or privilege of employment; and

5.      The employer knew or should have known about the harassment but failed to take prompt, corrective action.

Harassment is unwelcome conduct that is based on race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability or genetic information. Harassment becomes unlawful where 1) enduring the offensive conduct becomes a condition of continued employment, or 2) the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive. Anti-discrimination laws also prohibit harassment against individuals in retaliation for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding, or lawsuit under these laws; or opposing employment practices that they reasonably believe discriminate against individuals, in violation of these laws.

Petty slights, annoyances, and isolated incidents (unless extremely serious) will not rise to the level of illegality. To be unlawful, the conduct must create a work environment that would be intimidating, hostile, or offensive to reasonable people.

Offensive conduct may include, but is not limited to, offensive jokes, slurs, epithets or name calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put-downs, offensive objects or pictures, and interference with work performance. Harassment can occur in a variety of circumstances, including, but not limited to, the following:

•      The harasser can be the victim's supervisor, a supervisor in another area, an agent of the employer, a co-worker, or a non-employee.

• The victim does not have to be the person harassed, but can be anyone affected by the offensive conduct.

• Unlawful harassment may occur without economic injury to, or discharge of, the victim.

Prevention is the best tool to eliminate harassment in the workplace. Employers are encouraged to take appropriate steps to prevent and correct unlawful harassment. They should clearly communicate to employees that unwelcome harassing conduct will not be tolerated. They can do this by establishing an effective complaint or grievance process, providing anti-harassment training to their managers and employees, and taking immediate and appropriate action when an employee complains.

An employer can be liable for co-workers' harassing behavior under negligence principles. In such cases, the employer must have known or had reason to know of the harassment and failed to take adequate steps to address it.[45]  An employer may also be held liable for negligence under Title VII if an employer fires an employee based on a non-supervisory coworker's discriminatory actions. Specifically, an employer can be held liable if:[46]

• An employee's coworker makes statements maligning the employee for discriminatory reasons and with the intent to cause the employee's termination.

• The coworker's discriminatory acts proximately causes the employee to be terminated.

---

[45] See (29 C.F.R. § 1604.11(d); see also, Porter v. Erie Foods Int'l, Inc., 576 F.3d 629, 636 (7th Cir. 2009), EEOC v. Prospect Airport Servs., Inc., 621 F.3d 991, 1001 (9th Cir. 2010)).
[46] See Velazquez-Perez v. Developers Diversified Realty Corp., 753 F.3d 265 (1st Cir. 2014).)

• The employer acts negligently by allowing the coworker's acts to achieve their desired effect although the employer knows, or reasonably should know, of the coworker's discriminatory intent.

An employer can avoid liability for co-worker harassment if the employer promptly responds to the employee's complaints and effectively stops the co-worker's harassment. For example, an employer that painted over racist graffiti and individually warned each member of the complaining employee's shift that anyone who defaced the walls would be fired immediately took sufficient action to stop the harassment.[47]   Defendant REJ does not assert a Faragher-Ellerth defense because no action was ever taken to prevent Thomas Meyer or other employee's harassment of Denise Badgerow.

While Walters regularly told Badgerow that Thomas Meyer did not like her, he never once expressed a single reason to Badgerow for Meyer's dislike of her.[48]   Instead telling Badgerow that he believed Thomas Meyer was a misyoginst.[49]   Walters own statement to Badgerow shows he believed that Meyer was bullying Badgerow because of her gender.  This means Walters knew or had reason to believe that Badgerow was being subjected to workplace harassment on the basis of her gender.  But neither Walters nor any WMT partner took any steps to correct the hostile work environment and the harassment that Denise Badgerow was experiencing.

Walters knew that negative rumors were circulating in the office about Badgerow, specifically an untrue rumor that Walters was sleeping with Badgerow.  Both Ray Trosclair and his assistant Kristin Parish asked Denise Badgerow if she was sleeping with Walters and she assured each of them she was not.  Instead of calling all the employees of WMT into for a meeting

---

[47] See *Muhammad v. Caterpillar, Inc*., 767 F.3d 694 (7th Cir. 2014).
[48] Exhibit 1, p. 246:9-12.
[49] Exhibit 1, p. 247:1.

to shut down the salacious rumors and provide training on hostile work environment and discrimination, WMT did nothing for Badgerow. Badgerow was told to just "keep her head down" and stay out of sight. Simultaneously being counseled by Walters to "be nice" and say good morning to her fellow employees.

Furthermore, REJ submitted affidavits from two male AFA's Nathan Walters and Chris Callahan which are mothing more gender-based rumors and hearsay. Nathan Walters claims that he heard Badgerow make a sexual innuendo to a potential client at Dow's 2015 Jambalaya cook off event. He states that when a man asked if she had tried his team's jambalaya that Badgerow responded "she put his shit in her mouth and didn't like it. It was clear to me that it was a sexual comment." Chris Callahan's affidavit continues to spread gender-based rumors but his statement as to what Badgerow stated at the cook off contradicts the rumors included in Nathan Walters affidavit. Callahan states that "I heard Denise Badgerow make an inappropriate sexual comment to a Dow employee and potential client in front of my co-workers… She told the potential male client 'I already put you in my mouth and had to spit you out because I didn't enjoy it.'" Badgerow testified that she never made these comments to a potential client, that she never touched prospective clients in a sexual manner, never made sexually charged comments to clients on the phone, and did not dance provocatively at the WMT Christmas party.

In the case of *Parker v. Reema Consulting Services, Inc.* the Fourth Circuit held that slut shaming is considered gender discrimination under Title VII. The Plaintiff Parker sued her supervisor, a co-worker, and a human resources manager for creating a hostile work environment. Parker worked at Reema Consulting's Virginia warehouse for two years; during that time, she was promoted six times and rose from low-level clerk to Assistant Operations Manager. Within days of becoming the Assistant Manager, Parker became the subject of rumors that Parker was promoted

because she was sleeping with her manager. Parker lost at the District Court level, the court found that if Parker had been discriminated against, it wasn't on the basis of her gender, but rather, on the basis of her conduct. The Court found that the false rumor didn't relate to Parker's gender, but to her alleged choice bedfellows and Title VII doesn't protect people from discrimination based on their behavior.

Several employees participated in the rampant rumors. One employee asked Parkers manager, "Hey, you sure your wife ain't divorcing you because you're f–king [Parker]?" Parker was also treated with open resentment and disrespect and the work environment deteriorated to the point of outright hostility. Parker was excluded from meetings in which the false rumor was discussed, and her supervisor blamed her for how she'd handled the situation, even saying that he "should have terminated her" over it.

The Fourth Circuit, however, seized Parker's case as an opportunity to make a bold statement about what goes to the heart of womanhood; it ruled that accusations about sleeping one's way to the top are inherently directed at women, and as such, constitute gender discrimination under Title VII. The court articulated that theoretically, men could be falsely perceived to have used sex to their advantage, but in reality, slut shaming is borne by women on a far grander scale. The Court noted "[s]he plausibly invokes a deeply rooted perception – one that unfortunately still persists – that generally women, but not men, are susceptible to being labeled as "sluts" or worse, prostitutes selling their bodies for gain."

Walters now uses the "8th grade complaints" of Badgerow's fellow employees as the basis for his decision to terminate her.[50]  Effectively saying that the hostile work environment that WMT

---

[50] Exhibit 3, p. 208:14-15.

created was too stressful for him to deal with.  That surely does not fall within the confines of a Faragher-Ellerth defense and this court should follow the lead of the Fourth Circuit and stand up for females that are wrongly accused or insulted based upon their perceived sexual qualities.

### a.  Badgerow established a prima facie case of gender discrimination

REJ argues that Plaintiff's allegations of gender discrimination do not constitute adverse employment actions and therefore should be dismissed. Defendants assert that Plaintiff's discrimination claims fail as a matter of law, because she has not shown that she was treated less favorably than other similarly situated male employees. This argument is flawed and without merit.

Title VII prohibits a broad range of discriminatory employer conduct based on an individual's sex, including: terminating an employee; refusing to promote an employee; demoting an employee; discriminating with respect to an employee's compensation, terms, conditions, or privileges of employment such as access to equipment; and classifying or segregating employees in a way that deprives the employee of employment opportunities or adversely affects their status as employees.[51]

A prima facie case for sex discrimination requires that: 1) the plaintiff is a member of a protected class, 2) she was qualified for her job, 3) she suffered an adverse employment action, and 4) she was treated less favorably than other similarly situated male employees. Badgerow has met her burden of proof to establish a prima facie case of gender discrimination.  Badgerow is a member of a protected class and was qualified for her job. Badgerow was equally credentialed as the other FA and AFAs at WMT.  Badgerow suffered a number of adverse employment actions including, but not limited to: (i) receiving unequal compensation in both base salary and the method of draw of salary, (ii) not being provided updated marketing materials, (iii) not being

---

[51] 42 U.S.C. § 2000e-2(a)

allowed to attend male-oriented client development trips, and (iv) being denied a promotion to a "Financial Advisor."

WMT employed a pattern and practice of not hiring female client facing advisors. WMT allowed a pervasive hostile work environment to exists without taking any steps to address the bullying except to move Badgerow out from the office, offer to change her employment status to a 1099 employee and then terminate her when she complained outside the firm after she had already been complaining within the firm for years.

### b. Badgerow established a prima facie case of retaliation

Courts analyze retaliation claims under the same three-step, burden-shifting test created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* test a plaintiff must prove that: (1) [she] engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection between participation in the protected activity and the adverse employment action.[52] If the plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its actions. In addition to these requirements, the plaintiff must show that a reasonable person could believe that the alleged incidents would violate Title VII's standard.[53] Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to produce "some legitimate, nondiscriminatory reason" for the adverse employment action.[54] If the defendant is able to proffer

---

[52] *Gagnon v. Sprint Corp.*, 284 F.3d 839, 850 (8th Cir.), cert. denied, 537 U.S. 1001, 123 S. Ct. 485, 154 L.Ed.2d 396 (2002); see *Sowell v. Alumina Ceramics, Inc*., 251 F.3d 678, 685 (8th Cir.2001); *Buettner*, 216 F.3d at 713-714.

[53] *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) *Soto v. John Morrell & Co.* 285 F.Supp.2d 1146, 1176 (N.D. Iowa, 2003). See also, *Fortner v. Ameritech Corp.* 50 Fed. Appx. 187, 188-189, 2002 WL 31379880,*2 (6th Cir. Mich. 2002)("In order to establish a prima facie case of retaliation, the plaintiff must prove that: "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000)).

[54] *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

a nondiscriminatory reason for the adverse action, the burden shifts back to the plaintiff to produce credible evidence that the reason offered by the defendant is a mere pretext for unlawful retaliation.

Here Badgerow has established a prima facie case for retaliation. Badgerow testified that she complained to Walters on multiple occasions of the bullying, harassment, and discrimination she suffered from Tommy Meyer and other co-workers in addition to how she was being paid. Title VII protects employees from retaliation for complaints of discrimination.[55]

Badgerow complained to Greg Walters often about the harassment and the bullying from Meyer that she perceived as being baseless in person and in a number of text messages.[56] Walters testified that Badgerow would complain about what Tommy Meyers was saying and doing.[57] Instead of addressing the harassment by Meyer and his team, Greg counseled Denise on her demeanor with the other employees telling Denise to keep her head down, keep working and stay out of everyone's way.[58] Walters failed to take any action to correct the behavior and instead told Badgerow to ignore it. After months of no change and continued complaints from Badgerow, Walters decided to segregate Badgerow into a different office and terminate her employment relationship to make her a 1099 independent contractor.[59] Walters segregated Badgerow to appease the others.

Badgerow also complained to Walters about the manner in which she was paid.[60] Walters testified that Badgerow complained to him about not being paid through a payroll provider and that he wanted to correct the issue but his partners prohibited him from paying Badgerow

---

[55] *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321 (5th Cir. 2009).
[56] Exhibit 2.
[57] Exhibit 8, p. 66:18-19.
[58] Exhibit 3, p. 124:23 and 125:1-4
[59] Exhibit 1, p. 257:2-7.
[60] Exhibit 8, p. 47:13-48:5.

properly.[61] Badgerow later told Cohen about the payroll issue and she was terminated the same day that Ameriprise advised Walters of her complaint.[62]

REJ argues that Walters had a non-retaliatory reason for Badgerow's termination. REJ quotes Walters statement that he was in the middle of having one side of the office telling him every week that Badgerow was poison to the office and that he needed to either fire Badgerow and stay with his partners, or separate from the partnership and keep Badgerow as an employee. He testified that he chose to stay with the partnership.[63] REJ's affidavits demonstrate that several individuals requested that Walters fire Badgerow. In particular, Lynna Marcel inserted herself into the situation and contacted Walters specifically to ask that he fire Badgerow.[64] Marcel's text message states that: 1) she doesn't understand Walters and Denise's relationship; 2) everyone in the office has given Denise plenty of chances to earn their respect; 3) her poor pitiful me spill and everyone is against me reasoning is over played; 4) she understands Walters cares for Denise but claims that Denise would not be loyal to Walters "because she has already made it known she does not want to be your assistant"; and 5) asks that Walters fire Denise for the better of their group.

An employer faces liability if a coworker acted, for discriminatory reasons, with the intent to cause the plaintiff's firing; the co-worker's actions were in fact the proximate cause of the termination; and the employer allowed the co-worker's acts to achieve their desired effect though it knew (or reasonably should have known) of the discriminatory motivation.[65] Marcel was one of the co-workers who harassed Badgerow after Badgerow declined to be demoted to Walters assistant instead of a client-facing AFA. She directly requests that Walters fire Badgerow and

---

[61] *Id.*

[62] Exhibit 8, p. 79:5-9, see also FINRA Transcript 8/28/18, Testimony of Marc Cohen, p. 50:6-53:6, attached as Exhibit 10.

[63] REJ Exhibit D, FINRA Tr. At 330:2-17.

[64] REJ Exhibit I.

[65] *Velazques-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 267 (1 Cir. 5/23/2014).

implies that Badgerow is not loyal to Walters because she doesn't want to be his assistant. Walters didn't correct Marcel or instruct her to stop her harassing behavior, instead he apologized to Marcel. Walters asserts that he fired Badgerow to appease the other people at WMT. This clearly meets the standard and demonstrates that even REJ's proffered non-retaliatory reason for terminating Badgerow is illegal.

### c. Badgerow was paid less than other similarly situated male employees for performing the same work

REJ argues that Badgerow's EPA claim should be dismissed because it is time-barred and not supported by any credible evidence. The EPA prohibits employers from offering unequal pay for equal work based on sex. Equal work means work performed under similar working conditions that requires equal skill, effort and responsibility.  The period can be extended up to three years if the employer committed a willful violation through knowledge or reckless disregard of the fact that its conduct violated the EPA.  Additionally, the Lilly Ledbetter Fair Pay Act extends the statute of limitations for discriminatory compensation claims by clarifying "that a discriminatory compensation decision . . . occurs each time compensation is paid pursuant to the [discriminatory decision]."

REJ points to the case of *Hendrix v. Yazoo City*, as support for their baseless claim that REJ's decision to pay Badgerow by an annual salary draw was a discrete act that occurred in January of 2014. Hendrix involves a group of municipal firefighters who brought suit for a discriminatory reduction in pay more than three years after the reduction took effect. The issue before the court was whether the reduction in pay was a single act of discrimination under the FLAA, hence barred by its three-year statute of limitations, or whether the reduction effected in

each subsequent paycheck continued a violation of the act. The Fifth Circuit noted that the continuing violation doctrine embraces two types of cases. The first includes cases in which the original violation occurred outside the statute of limitations, but is closely related to other violations that are not time-barred. In such cases, recovery may be had for all violations, on the theory that they are part of one, continuing violation. The second type of continuing violation is one in which an initial violation, outside the statute of limitations, is repeated later; in this case, each violation begins the limitations period anew, and recovery may be had for at least those violations that occurred within the period of limitations. The Hendrix court pointed out that the distinction of whether an act is continuing or if the discrimination alleged is solely the result of a single violation that occurred outside the statute of limitations does not turn on the type of discrimination, but on whether the practice at issue is part of, or a repetition of, a past discriminatory act, in which case there is a continuing violation, or whether it is facially neutral, simply giving effect to prior discrimination, in which case there is no continuing violation.

Badgerow's EPA claim is not a discrete act but a continuing violation. Kern had to make a determination at every pay period how much of a draw she would deduct from Badgerow's pay and how much money to put in Badgerow's bank.

### Badgerow's Pay as Compared to the Other Associate Financial Advisors

Although Badgerow was never provided a written compensation agreement, as compensation for her services as an associate financial advisor to WMT, Badgerow received a $30,000 annual draw against commissions, and no base salary. The written employment agreements that REJ produced during discovery show that all the male associate financial advisors hired prior to Denise Badgerow earned a base salary, although they fail to provide the commission breakpoints of the AFAs. The pay records and GDC commission reports produced establish this

24

compensation was in addition to the GDC commissions they received from Ameriprise.[66]  WMT, REJ and Ameriprise records establish that WMT employed the following client-facing (commission earning) associate financial advisors:

| Associate Financial Advisor | Hire Date | Base Salary at time of hire as an AFA | Type of Draw |
| --- | --- | --- | --- |
| Lloyd "Petey" Kern | 3/23/2007 | $52,000 | Unable to tell from records |
| David Ponson | 3/23/2007 | $19,500 | Unable to tell from records |
| Andrew Walters | 2/27/2012 | $$26,000 | Unable to tell from records |
| Evan Weibel | 5/16/2013 | $10.50/hour | Unable to tell from records |
| Denise Badgerow | 3/17/2014 | None | Annual/Calendar year draw |
| John Meyer | | None | Per pay period draw |
| Chris Callahan | | None | Per pay period draw |
| Nathan Walters | | None | Per pay period draw |

Lloyd Kern, an associate financial advisor that was hired in 2007, after graduating from Nicholls State University in 2004, was hired with a base pay of $52,000 and bonuses based on performance.[67]  At the same time, WMT hired David Ponson and his employment agreement shows that he was paid a base salary of $19,500.[68]  On February 27, 2012, WMT hired Andrew Walters who had graduated from Appalachian State University in 2011, with a base salary of $26,000.[69]  Finally, Evan Weibel, the associate financial advisor hired in May 16, 2013, only 6

[66] See Employment Agreements, attached hereto as Exhibit 11.
[67] Exhibit 11.
[68] Exhibit 11.
[69] Exhibit 11.

months prior to Badgerow was paid a base salary of $10.50 for 40 hours per week.[70]   Denise Badgerow received no base compensation at all, she was paid solely on the basis of a salary draw against commissions she earned which clawed back any commissions earned during an entire calendar year, not just on a per pay period basis.

About a year after Badgerow had worked at WMT, three other associate financial advisors were hired: John Meyer, Chris Callahan and Nathan Walters.  These associate financial advisors were paid on the basis of a salary draw, but the manner in which their draw was calculated was different.  Instead of reducing each of these employees draws against amounts earned throughout the entire year, on a calendar basis as Badgerow, these AFAs were paid on a salary draw that only deducts draws on a per pay period basis.

In his deposition, Thomas Meyer explains the manner in which Denise is paid differently from these AFAs hired after her, as follows:

Q.  Okay. I want you to walk me through how Denise 's salary draw works.  So Denise is hired as we talked about before…She's hired in January.  She's appointed as an AFA in March. She earns her first commission in October.  And so, just as with John and Chris, a GDC tracker is started in which it – a calculation is made.  How much does Denise earn in commissions for her first commission?

A.  What I see here is $54,307 in GDC times 91% is $49,419.37.[71]

….

Q.  Okay. So let's walk through this calculation. So this calculation, she earns as you said $54,307 in commissions.  You, just like with John multiplied that by the 91% factor to come up with a number, and then at this point you subtracted $24,230.85, correct?

A.  That appears to be correct.

Q.  What does that --- what is $24,230.85 represent?

A.  I assume that would be her salary to that point, but I cannot answer that definitively.[72]

---

[70] Exhibit 11.
[71] Exhibit 7, p. 95:25 – 96:14.
[72] Exhibit 7, p. 98:3-15.

….

      A.  It seems to be a reasonable assumption.

Q. And then in addition to that number, there's an additional $2,307.70 subtracted, correct?

A.  That is correct.

Q. And what does that number represent?

A.  I do not know.

Q. Okay. If you look over here, there's what is denoted as a ["bank"].

A.  Okay.

Q. Was Denise the only employee that was required to keep a Bank?

A.  I think that I am correct when I say that Denise wanted a bank going forward.

Q.  Was – were John and Chris given the option to have a bank?

A. John and Chris were on a different pay schedule.

Q. I thought – and let me see if I am correct here – that John and Chris and Denise were all being paid the same way?

A.  They were all being paid equally as far as the breakdown of the percentage they received of compensation.

Q. What was different?

A.  Could you be more specific?

Q. What was – how are John and Chris paid differently from Denise Badgerow?

A.  John and Chris were not paid commissions if they didn't exceed their bi-weekly pay. Denise did not receive commissions unless she exceeded her bi-weekly pay.

Q. Help me walk through that.  And none of this – for Denise's is in writing, correct?

A. What is in writing is the Word document that states the break points for the percentage of commission.  That's what they receive.

Q. But the base salary is what's different, is what you're telling me?

A. Correct.

Q. Okay.  So John and Chris have a base salary of a certain number and Denise does not?

A.  It's not necessarily a salary because as you can see John's, he does not receive any commissions unless he exceeds his salary.

Q. So it's a different form of salary draw, is that what you are saying?

A. I would say that's a fair statement.

27

Q. And it's different form of salary draw because Denise's salary…she's required to repay any compensation she's ever received out of commissions that she earns; whereas John and Chris only have to pay back their base salary if they earn commissions in excess of that number?

A. I don't understand the question.[73]

….

Q. If Denise earns more in commissions than her base salary, the agreement was what?

A. I think that would be a question that she would discuss with Greg.

Q. Okay. And was Greg the one that approved this calculation?

A. Greg is the one that communicated the compensation package with Denise.

Q. And did you confirm – did you confirm with Greg what Denise's pay was?

A. Absolutely.

Q. And what was your understanding?

A. Denise was going to be paid a salary draw.

Q. A salary draw, but a different salary draw then your two advisors?

A. Correct.

Q. Okay. And different from all the financial advisors?

A. So that is incorrect in the fact that both Petey and David, when they started, were on a salary draw identical to Denise's.[74]

Mr. Meyer's assertion that David Ponson and Lloyd "Petey" Kern were on a salary draw identical to Denise Badgerow is contradicted by the employment agreements produced for those two AFAs, which agreements each show that those advisors received a Base Salary separate. The payroll records show in addition they earned GDC compensation through Ameriprise's third party payroll provider, Employshare.

**d. Whether WMT breached its contract to pay Badgerow a base salary or whether they breached other agreements with Badgerow is a material issue of fact.**

---

[73] Exhibit 7, p. 99:8- 101:24.
[74] Exhibit 7, p. 102:16 – 103:11.

REJ argues that Badgerow's breach of contract claim should be dismissed because there is no evidence other than her own testimony that REJ agreed to pay her a fixed salary plus commission. REJ also argues that Walters testified that his agreement with Badgerow was for an annual salary draw. REJ's own argument points out that there is a material issue of fact in dispute as to the contract claim. Badgerow asserts that she was supposed to be paid base salary plus commission and Walters claims that it was an annual salary draw. Accordingly, the conflicting positions and testimony must be evaluated by the trier of fact to determine if REJ breached its contract with Badgerow, and is not appropriate for summary judgment.

### REJ's Statement of Uncontested Material Facts

For the reasons stated above and cited herein, Badgerow disputes all of REJ's Statements of Uncontested Facts that include the term REJ or WMT.  As previously discussed, these are two separate and distinct entities, one is a business partnership comprised of three business partners and the other is a Louisiana real estate holding corporation and payroll corporation, not engaged int the business of providing financial services.  The following statement of fact numbers are disputed for these reasons: 1-9; 11-12; 14; 17-18; 27; 3-34; 42; 50; 63; 67; and 74.  Each of these facts as stated are incorrect atleast due to their reference of the term REJ and/or WMT.  Of the remaining facts stated that do not reference either REJ or WMT, we dispute all facts as stated other than Defendant's paragraphs numbered 10, 15, 16, 17, 27, 37-43, 49-51, 53, 56-59 for the reasons fully cited to herein and evidence of record in this matter.

### OBJECTIONS TO DECLARATIONS

Plaintiff objects to the Declarations of John Meyer, Kylie Kern, Andrew Walters, Lynna Marcel, Nathan Walters, Thomas Meyer and Christopher Callahan that contain hearsay.

**CONCLUSION**

REJ is not entitled to summary judgment because there are genuine disputes as to several material facts. For the reasons outlined above, Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion for Summary Judgment.

Respectfully Submitted:

BUSINESS LAW GROUP, LLC

**By:** /s/ Stephanie Dovalina
**Amanda J. Butler (T.A.)**
**LSBA # 31644**
**abutler@lawgroup.biz**
**Stephanie Dovalina**
**LSBA# 31137**
**sdovalina@lawgroup.biz**
**700 Camp St., Ste. 405**
**New Orleans, LA 70130**
**Telephone: (504) 528-9500**
**Facsimile: (504) 754-7776**

CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2019, a copy of the above and foregoing has been served upon counsel for all parties by electronic means and filed electronically with the Clerk of Court using the CM/ECF system.

/s/ Stephanie Dovalina
Stephanie Dovalina, Esq.
Business Law Group

30