UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DENISE A. BADGEROW                          CIVIL ACTION

VERSUS                                      NO: 17-9492

REJ PROPERTIES, INC., ET AL.                SECTION: "A" (2)

## ORDER AND REASONS

The following motion is before the Court: **Motion for Summary Judgment (Rec. Doc. 73)** filed by defendant REJ Properties, Inc. d/b/a Walters, Meyer, Trosclair & Associates. Plaintiff Denise A. Badgerow opposes the motion. The motion was submitted for consideration on the briefs upon receipt of Defendant's reply memorandum on April 15, 2019. (Rec. Doc. 110, Order setting deadlines).

For the reasons that follow, the motion is GRANTED.

## I.      Background

Plaintiff Denise Badgerow ("Badgerow" or "Plaintiff") has filed this action against her former employer, REJ Properties, Inc. d/b/a Walters, Meyer, Trosclair & Associates ("WMT"), and Ameriprise Financial Services, Inc. Ameriprise is a registered broker dealer that offers financial products and services to customers through several models, including through a franchisee-based platform of independent advisors who own and operate their own businesses as franchises. Ameriprise's principal place of business is located in Minneapolis, Minnesota.

WMT was a small private financial advisory practice affiliated with Ameriprise.

The principals of WMT were Gregory Walters, Thomas Meyer, and Ray Trosclair, and those individuals were Ameriprise Franchise Financial Advisors during the period of Badgerow's employment. WMT was a d/b/a or branding name recognized by Ameriprise to allow franchise advisors to practice and market as a team, and it was operated and managed by Walters, Meyer, and Trosclair. WMT was domiciled in Lafourche Parish, with its main office located in Thibodaux, Louisiana.[1]

REJ Properties, Inc. was a corporate entity that WMT used when a juridical entity was necessary to WMT's operations. REJ Properties is the entity that paid WMT's employees during the time of Badgerow's employment.[2]

Greg Walters was the principal who hired Badgerow in January 2014. Badgerow completed a 90-day probationary period with WMT, and was ultimately promoted to Associate Financial Advisor ("AFA"), a title recognized by Ameriprise, when she passed her Series 7 exam. Walters mentored Badgerow throughout the brief period of time that she was with WMT and he helped to shape her career.

---

[1] WMT dissolved in October 2016.

[2] In her opposition memorandum Plaintiff argues that WMT and REJ were the collective enterprise that jointly employed her. In a proposed amended pleading that Plaintiff was denied leave to file, Plaintiff alleged that WMT was an entity with the capacity to be sued, and that the Court should ultimately pierce the corporate veil so that WMT's principals would be personally liable for her damages. (Rec. Doc. 125-2, Proposed first amended and supplemental pleading).

The relationship between WMT and REJ and any of the principals of those entities has nothing whatsoever to do with whether Badgerow can create an issue of fact sufficient to defeat summary judgment on her claims. In other words, Badgerow's case has not suffered due to her failure to join the necessary defendants and she has suffered no prejudice from being denied leave to amend her Complaint. Rather, as the Court explains in detail below, Badgerow's case fails because her own deposition testimony demonstrates that she does not have an actionable claim against anyone arising out of her employment with WMT. Joining additional defendants and conducting additional discovery would do nothing more than increase litigation costs. Issues related to joint employer status, corporate form, and piercing the corporate veil are moot points in this case.

Becoming an AFA was significant in that Badgerow would now be eligible to earn commissions. One of Badgerow's claims in this case is that WMT retroactively changed her compensation structure in October 2014 after she made a large commissioned sale.

Badgerow contends that she was ill-used in a myriad of ways during her employment at WMT and she attributes this to her gender. Badgerow contends that she was bullied by Thomas Meyer as well as her female co-workers in the office.

On July 26, 2016, Walters terminated Badgerow after she declined to voluntarily resign. Badgerow contends that Walters terminated her in retaliation for speaking with Marc Cohen, who works for Ameriprise. During a telephone evaluation Badgerow had told Cohen that WMT was not paying her commissions through the Ameriprise-approved system. Badgerow had also complained to Cohen that she was being treated poorly at WMT.

Badgerow filed a Charge of Discrimination against WMT on September 8, 2016, claiming gender discrimination and retaliation. (Rec. Doc. 27-3 at 5). On October 6, 2016, she amended the charge to include class allegations. (*Id.* at 8). On June 27, 2017, the EEOC issued a dismissal and notice of rights (*Id.* at 13).

Badgerow filed the instant action and jury demand on September 22, 2017, against WMT and Ameriprise.[3]  Badgerow's original complaint alleged eleven causes of

---

[3] In an Order and Reasons entered on January 10, 2018, the Court granted Ameriprise's motion to compel arbitration and stayed all claims against Ameriprise pending the conclusion of the arbitration. (Rec. Doc. 47, Order and Reasons). The FINRA arbitration panel issued its award on December 27, 2018, and that body dismissed all of Badgerow's claims against Ameriprise with prejudice. (Rec. Doc. 99-2 at 82). FINRA is "a quasi-governmental agency responsible for overseeing the securities brokerage industry." *McCune v. United States Sec. & Exch. Comm'n*, 672 F. App'x 865, 866 (10th Cir. 2016) (quoting *ACAP Fin., Inc. v. United States SEC*, 783 F.3d 763, 765 (10th Cir. 2015)). Ameriprise now has pending separately before the Court its motion to confirm the arbitration award.

action against WMT, including claims for violations of Title VII (gender-based hostile work environment and retaliation),[4] and the Equal Pay Act, 29 U.S.C. § 206(d)(1) (disparate pay based on gender). Badgerow also brought a claim for disparate treatment based on gender[5] as well as a breach of contract claim.

WMT now moves for summary judgment on all of Badgerow's remaining claims.[6]

---

[4] These claims are also asserted under state law, Louisiana's Employment Discrimination Law, La. R.S. § 23:301, *et seq.* Louisiana courts rely upon Title VII standards when addressing liability for LEDL claims. *Knapper v. Hibernia Nat'l Bank*, 49 So. 3d 898, 902 (La. App. 4th Cir. 2010) (citing *Hicks v. CLECO, Inc.*, 712 So. 2d 656 (La. App. 1st Cir. 1998)); *see Plummer v. Marriott Corp.*, 654 So. 2d 843 (La. App. 4th Cir. 1995). Badgerow does not dispute this point.

[5] Badgerow had hoped to assert her disparate treatment claim on behalf of a class of similarly-situated females. Recently, the class action claims were dropped from this lawsuit by consent, (Rec. Doc. 148, Magistrate Judge's Order and Reasons), but not until WMT had provided extensive briefing as part of this motion for summary judgment. This Court expressly noted on the record that the class action claims were without merit, (Rec. Doc. 150, Order striking non-compliant pleading), because the basis of the class claims was Badgerow's contention that female employees at WMT were not given the opportunity to become "client-facing" AFAs. (Badgerow depo. at 158). Discovery revealed that this contention was false because other females *were* given the opportunity to become client-facing AFAs but declined it. (Rec. Doc. 73-7, Kern decl. ¶ 6; Marcel decl. ¶ 3). Further, Badgerow *was* a client-facing AFA so she lacks standing to represent a class of women (which as it turns out does not exist) who, because of gender discrimination, were not allowed to become client-facing AFAs. Aside from the fact that the evidence directly contradicts her class allegations, Badgerow could not satisfy any of the Rule 23 requirements for maintaining a class action because her claims were neither representative nor typical of any other female at WMT. Badgerow likewise could not demonstrate numerosity.

[6] In the same Order and Reasons granting Ameriprise's motion to compel arbitration, the Court determined that certain of Badgerow's claims against WMT failed as a matter of law. First, Badgerow's eighth cause of action was for a federal civil rights conspiracy under 42 U.S.C. § 1985(3). This statute, which requires racial animus as an element, is inapplicable to Badgerow's gender-based discrimination claims. Badgerow has not asserted any race-based claims.

Second, Badgerow's ninth cause of action for conspiracy under state law pursuant to Louisiana Civil Code article 2324 was dismissed. Civil conspiracy is not an actionable claim under Louisiana law. *Crutcher-Tufts Res., Inc. v. Tufts*, 992 So. 2d 1091, 1094 (La. App. 4th Cir. 2008) (citing *Ross v. Conoco, Inc.*, 828 So. 2d 546 (La. 2002) (explaining that it is the tort that the conspirators agreed to perpetrate and which they actually commit that constitutes the actionable elements of the claim)). Article 2324 expressly pertains to intentional torts under Louisiana law. No state law intentional tort is alleged in this case. (Rec. Doc. 47, Order and Reasons at 4 n.5).

## II.    WMT's Motion for Summary Judgment

WMT now moves for summary judgment arguing that Plaintiff's claims of discrimination, harassment, and retaliation should be dismissed because she does not present a prima facie case as to those claims nor create a triable issue of fact on the merits. WMT argues that Badgerow's Equal Pay Act claim is time-barred in whole or in part, and that she otherwise has failed to present evidence of any gender-based disparity in pay. Finally, WMT argues that Badgerow's breach of contract claim fails because she has no evidence of an agreement to pay her a fixed salary plus commission after she became an AFA.[7]

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson,* 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U.S.

---

[7] WMT has also argued that it was not a "covered" employer for purposes of the LEDL because during all times relevant it employed less than twenty employees. In response to this contention Badgerow has argued that more discovery is necessary to refute this contention. Similar to what the Court explained in note 2 above, even if additional discovery could establish that WMT was a covered employer, that point is moot if Plaintiff cannot create an issue of fact as to unlawful discrimination.

317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

When faced with a well-supported motion for summary judgment, Rule 56 places the burden on the non-movant to designate the specific facts in the record that create genuine issues precluding summary judgment. *Jones .v Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). The district court has no duty to survey the entire record in search of evidence to support a non-movant's position.[8] *Id.* (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1992); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988)).

### 1. *Hostile Work Environment*

Badgerow worked closely with Greg Walters, the principal who hired her. Walters was the sole principal with authority to fire Badgerow. (Badgerow depo. at 55). Badgerow has never suggested that Walters contributed to the allegedly abusive environment at WMT. In fact, it is clear that Walters did everything he could to help

---

[8] The Court stresses this last point because Badgerow submitted nearly 900 pages in opposition to WMT's summary judgment motion even though only portions of the exhibits are referred to in her opposition memorandum. The Court considers any arguments based on exhibits or portions of exhibits that were not expressly referenced in briefing or cited with specificity as waived. Further, Badgerow's opposition is replete with citations to decisions and rulings that do not control in this circuit. This Court has no duty to survey the jurisprudence from this circuit in search of decisions helpful to Badgerow.

Badgerow succeed at WMT, and that he protected her a lot. *Id.* at 197. Walters gave Badgerow the same split of new business leads that he gave to his own nephews and he did this because he is a nice person. *Id.* at 93.

Badgerow's hostile work environment claim appears to have two facets. First, Badgerow complains that Thomas Meyer, one of the other principals at WMT, subjected her to unwelcome harassment that was not sexual in nature. Badgerow testified that Meyer, with whom she rarely dealt with in person, bullied her by using Skype software messages and email. Badgerow felt singled out. (Badgerow depo. at 153). Meyer would send her messages like "I know what you said," and then when Badgerow would ask him what he meant he would not explain. *Id.* Badgerow deleted Skype from her computer but Meyer stood over her desk and made her reinstall it. *Id.* He also came by her desk one evening and told her that "I just want to let you know that no one is jealous of you." *Id.* at 247. Badgerow attributes Meyer's negative treatment of her to her gender. Badgerow believes that Meyer treated her poorly because she was the only client-facing AFA, and that she refused to work as an assistant to Walters.[9]

The second facet of Badgerow's hostile work environment claim is that the rest of the office staff, with the exception of Walters and Trosclair,[10] bullied her because "they" would schedule events, and then change the plans without telling her. (Badgerow depo.

---

[9] Badgerow's subtle attempt to cast the assistant position as one that WMT viewed as being more appropriate for a female is unconvincing. Walters had had a male assistant for several years so the job was not strictly one relegated to females. (Rec. Doc. 73-6, Walter depo. at 36). And even female staff members at WMT were put out by how fast Walters had brought Badgerow along.

[10] No allegations of ill treatment have been made against Walters or Ray Trosclair, the latter having worked from another location.

at 127). Badgerow claims that she was constantly excluded from things. *Id.* at 195.

WMT argues that Badgerow has no evidence to support her hostile work environment claim. In particular, WMT argues that the statements that Badgerow does complain about are not linked to her gender, and they fail as a matter of law to be sufficiently severe or pervasive so as to support a claim for gender based hostile work environment discrimination. As to any ill treatment by either Meyer or other members of the office staff, WMT points out that Badgerow was a disruptive employee who was generally disliked by her co-workers.

To establish a claim of hostile work environment under Title VII a plaintiff must prove that she 1) belongs to a protected group; 2) was subjected to unwelcome harassment; 3) the harassment complained of was based on gender; 4) the harassment complained of affected a term, condition, or privilege of employment; 5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005) (citing *Green v. Admin. of Tulane Educ. Fund*, 284 F.3d 642, 655 (5th Cir. 2002); *Woods v. Delta Beverage Grp., Inc.*, 274 F.3d 295, 298-99 (5th Cir. 2001)). Conduct sufficient to create a hostile working environment must be severe or pervasive. *Id.* (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998)). To be actionable, the alleged harassment must have created an environment that a reasonable person would find hostile or abusive. *Id.* (citing *Woods*, 274 F.3d at 299). Whether an environment is hostile or abusive depends on the totality of the circumstances, including factors such as the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes

with an employee's work performance. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).

The conduct that Badgerow complains about is insufficient as a matter of law to support a gender-based claim for hostile work environment. First of all, regardless of how abusive or hostile Badgerow perceived her work environment to be, neither the comments from Meyer nor the "bullying" of the other coworkers (who were female and not identified with any specificity) suggest any type of gender bias. Badgerow had been told from the beginning that many people at the WMT office did not like her, (Badgerow depo. at 157), and she knew that Meyer and her female co-workers had a negative opinion about her because of the way that she treated other people, *id.* at 118, 158. At times others found Badgerow to be discourteous and unprofessional and Badgerow knew this although she viewed it as other people just perceiving her differently. *Id.* at 40. The comments and the co-workers' conduct are just as consistent (if not more so) with dislike for Badgerow as with gender discrimination and the former is not proscribed by law.

Further, it is now clear that several of Badgerow's co-workers, both male and female, lobbied Walters to fire Badgerow because they believed that her treatment of others, which they at times perceived as being cruel, rude, disrespectful, and mocking, negatively affected the environment of the small office. (Rec. Doc. 73-4, Exhibit A Greg Walters decl.; Rec. Doc. 73-7, Exhibit E Hornsby decl.; Exhibit H Andrew Walters decl.; Exhibit J Nathan Walters decl.). The record contains evidence of this discord and dislike that predates both Walters' decision to terminate Badgerow and this litigation. (Rec.

Doc. 73-7 Exhibit I-1, Lynna Marcel text).[11]

Moreover, Meyer made crass (although never sexual or lewd) comments to other employees besides Badgerow, including male employees. (Rec. Doc. 73-6, Exhibit D Transcript at 127). In her arbitration testimony Badgerow acknowledged that Meyer used Skype to say hurtful things to other employees and to put them down. *Id*. at 126. Badgerow believed generally that the atmosphere at the office suffered due to Meyer's conduct so she was not singled out.[12] *Id*. at 128. Simply, Badgerow has no evidence to suggest that anyone else's conduct toward her specifically was related to her gender.[13] But because Badgerow believes that she did nothing wrong and that everyone else acted unjustly in disliking her, she surmises that by default their conduct could only be linked to her gender. Unlawful discrimination must be proven affirmatively, not by default, and Badgerow's subjective belief is insufficient to create a triable issue of fact.[14]

---

[11] Badgerow's opposition includes a blanket hearsay objection to WMT's declarations offered in support of summary judgment. Even if the declarations include hearsay statements, the pertinent parts of those declarations that the Court relies upon are not hearsay. Badgerow fails to recognize that so long as the witnesses' statements themselves would be admissible if offered from the witness stand at trial, those statements can be used in support of WMT's motion for summary judgment even though the declarations themselves would be considered hearsay at trial. *See Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (revised July 5, 2017)).

[12] In fact, after Badgerow took it upon herself to forward information about another employee's personal tragedy, Meyer did not mention Badgerow by name (even though he knew it was her) in his excoriating rebuke of what he characterized as a stupid and senseless act given that the aggrieved employee was in the group text. (Badgerow depo. Exhibit B-37).

[13] Badgerow testified that Greg Walters had speculated to her once that Meyer probably didn't want a female working as a client-facing AFA, (Badgerow depo. at 245), and that he might be a misogynist, (*id*. at 142). These speculative statements are insufficient to defeat summary judgment on the hostile work environment claim.

[14] Even Badgerow's subjective belief as to why Meyer and others treated her negatively has vacillated at times. When Badgerow complained to Marc Cohen with Ameriprise that she was not being treated fairly at WMT, she said that she did not know if it was because she was a

But even if Meyer's comments and the other co-workers' conduct had been indicative of gender bias, that conduct does not rise to the level of severity so as to have altered the conditions of Badgerow's employment. Badgerow did not work directly with Meyer and she rarely interacted with him in the office. In fact, Badgerow believes that Meyer tried to avoid interacting with her in the office. (Badgerow depo. at 118). Badgerow has not produced a single discriminatory email or discriminatory text from Meyer, and the comments and behavior that she describes in her deposition are not particularly abusive or worse than the way that Meyer acted with other male employees. Accepting as true Badgerow's claims as to the Skype messages,[15] Badgerow has not demonstrated that those messages were so pervasive or so severe as to alter the conditions of her work environment.

In that vein, there is no evidence whatsoever that Meyer's or anyone else's conduct at the office interfered with Badgerow's job performance. Badgerow not only rejects WMT's contention that her job performance was mediocre, she considered herself to be performing quite well at WMT. (Badgerow depo. at 245). And Badgerow was hardly cowed by anyone's conduct at the office. She was comfortable confronting Meyer in person about his comments (Badgerow depo. at 215) and getting "in his face" to try to get him to explain himself. (WMTA-000056, Text). Although Badgerow alleged in her Complaint that she was driven to seek medical attention for depression, stress,

_____

woman or because she was not family (WMT principals often hired family members to work in the business). (Badgerow depo. at 298 & Exhibit 27). During her deposition Badgerow candidly admitted that she was never really certain of the reason that she was treated differently. (Badgerow depo. at 297).

[15] The only evidence that Badgerow has as to the Skype messages is her own testimony.

and anxiety, (Complaint ¶ 22), no evidence of such was produced.

In sum, WMT is entitled to judgment as a matter of law on Badgerow's federal and state law gender-based hostile work environment claim.

## 2. *Retaliation*

Badgerow contends that Walters terminated her employment with WMT in retaliation for complaining to him about Meyer's bullying, and in retaliation for complaining to Marc Cohen about 1) the way her commissions were paid at WMT, and 2) the poor treatment she received at WMT, which Badgerow admitted could have been a product of nepotism and not gender discrimination.

WMT argues that Badgerow cannot establish a prima facie claim of retaliation under Title VII because she did not engage in "protected activity."

Title VII's anti-retaliation provision states in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Title VII claims of unlawful retaliation based on circumstantial evidence are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Vargas v. McHugh*, 630 Fed. Appx. 213, 216 (5th Cir. 2015) (per curiam). First the plaintiff must establish a prima facie case of retaliation by showing that 1) she participated in an activity protected under the statute; 2) her employer took an adverse employment action against her; and 3) a causal connection

exists between the protected activity and the adverse action. *Feist v. La. Dep't of Justice*, 730 F.3d 450, 454 (5th Cir. 2013) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007)). If the plaintiff makes a prima facie showing of retaliation, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. *Id.* (quoting *LeMaire v. Louisiana*, 480 F.3d 383, 388-89 (5th Cir. 2007)). Finally, the burden shifts back to the plaintiff to prove that the employer's proffered reasons are a pretext for retaliation. *Id.* The employee meets this burden by showing that the adverse action would not have occurred "but for" the employer's retaliatory motive. *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)).

The Supreme Court's *Nassar* decision clarifies that a plaintiff asserting a Title VII retaliation claim must meet a higher standard of causation than a plaintiff claiming Title VII discrimination. *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015) (quoting *Nassar*, 133 S. Ct. at 2534). Thus, mere proof that retaliation was a "motivating factor" for an adverse employment action will not suffice. Rather, the plaintiff must establish that his protected activity was a "but for" cause of the alleged adverse action by the employer. *Id.* In order to avoid summary judgment, the plaintiff must show "a conflict in substantial evidence" on the question of whether the employer would not have taken the action "but for" the protected activity. *Feist*, 730 F.3d at 454 (quoting *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir. 1996)).

Walters terminated Badgerow's employment on July 26, 2016. It is undisputed that Walters acted alone as to that adverse employment action. (Badgerow depo. at 184). Up until the time that Walters fired Badgerow they had been close and she believes that

Walters was sincerely sorry for terminating her.[16] *Id.*

Badgerow testified that she was terminated for reporting non-compliance to Marc Cohen with Ameriprise. (Badgerow depo. at 301). The specific non-compliance that Badgerow refers to is WMT's failure to comply with Ameriprise's administrative requirements regarding commission-paying software. This is what Badgerow refers to as being paid "incorrectly." *Id.* at 296.

As the Court explained in its Order and Reasons entered on January 10, 2018, when it granted Ameriprise's motion to compel arbitration, retaliation on this basis is not actionable under Title VII because reporting non-compliance with Ameriprise's Financial Manual is not a protected Title VII activity. (Rec. Doc. 47 at 3 n.3). Even if it were protected activity, Badgerow has no evidence to refute Walters' assertion that Cohen did not speak to him about non-compliance until *after* Badgerow had been terminated. (Rec. Doc. 73-6, Walters' depo. at 122-23). Therefore, Badgerow's prima facie case of retaliation also fails as to the causation prong.

Badgerow also contends that Walters terminated her in retaliation for complaining to Cohen about harassment. As the Court explained in its Order and Reasons entered on January 10, 2018, when it granted Ameriprise's motion to compel arbitration, Cohen is not an EEO compliance officer and when Badgerow complained to him he told her more than once that neither he nor Ameriprise could help her with respect to discrimination issues at WMT. *Id.* Neither Cohen nor anyone at Ameriprise

---

[16] Interestingly, in the aftermath of the termination, Badgerow and Walters exchanged a series of poignant texts that demonstrate the mutual affection and respect that they had for each other at the time. (WMTA-000310 to 000318).

had supervisory authority over WMT's staff and principals. Moreover, when Badgerow vented to Cohen about the way that she was treated at WMT, she specifically told him that she was not sure that the reason was because of her gender. The Court is persuaded that Badgerow's conversation with Cohen does not constitute protected Title VII activity. But even if the conversation with Cohen was protected Title VII activity, Badgerow has no evidence to refute Walters' assertion that Cohen did not divulge to him the specifics of Badgerow's "harassment" complaints but rather just kept repeating that Walters should hire a labor attorney. (Rec. Doc. 73-6, Walters depo. at 79-80). Therefore, Badgerow's prima facie case of retaliation also fails as to the causation prong.

Badgerow argues in her opposition that Walters terminated her in retaliation for complaining *to him* about the bullying from Meyer and the other office staff. Assuming arguendo that this was protected Title VII activity, Badgerow does not present a prima facie case as to causation. And the lack of a prima facie case aside, as explained below, Badgerow presents no evidence to rebut Walter's proffered non-retaliatory reason for terminating her, much less evidence to create an issue of fact as to but for causation.

Walters' fired Badgerow after he received a phone call from Marc Cohen in which Cohen told Walters that he should hire a labor attorney in relation to Badgerow. (Rec. Doc. 73-6, Walters depo. at 81). Walters then attempted to ask Badgerow what was going on and whether she was planning to sue him for some reason and she would not answer him. *Id.* Walters testified that he terminated Badgerow because his own health was suffering over the stress that he was enduring because of the dissension that she was causing at WMT. *Id.* It is undisputed that Walters had been having health problems, and it is undisputed that Badgerow was a polarizing person who had a number of

detractors in the small office. Other employees had been urging Walters to fire Badgerow for some time before he actually took action on those requests.

In fact, it is clear that Walters wanted Badgerow to succeed at WMT and that he did everything he could to make her employment there successful. Although Badgerow did not have any significant clients of her own and did not excel at bringing in new business, Walters explained that she was exceptional at working with his clients and that the client-facing skills that she had were something that you cannot easily cultivate in people. (Walters depo. at 58, 77). Walters gave Badgerow the biggest accounts that any AFA had been allowed to service in 29 years so that she could earn commissions. *Id*. at 62. Walters hoped to groom Badgerow to be able to take over his portion of the business when he retired. *Id*. at 55. Walters had confided in Badgerow about his health problems and she had worked closely with him so that he could continue in his profession. Walters had talked Badgerow out of quitting in the past because he feared that the partnership was going to break up and he wanted her to stay with him so that they could continue to work together if that occurred. *Id*. at 113.

Moreover, Walters valued Badgerow so highly that in lieu of terminating her earlier in 2016, which is what most of the other WMT staff had been lobbying Walters to do for some time, he proposed setting Badgerow up in her own remote office in Houma, Louisiana as an independent contractor of WMT. (Rec. Doc. 73-4, Exhibit A-2). Walters hoped that this proposal would be a compromise solution that would allow him to continue to work with Badgerow yet would remove her from the office environment both to her satisfaction and to that of the other employees who disliked her immensely. (Rec. Doc. 73-4 Exhibit A-2). The Houma office was a nice office in a good location.

(Badgerow depo. at 233). Meyer objected to the arrangement because he viewed it as rewarding Badgerow for disruptive behavior, especially since she would be making more money than any other AFA. (Badgerow depo. Exhibit B-39). After Walters terminated Badgerow he reimbursed her several thousand dollars out of his own funds for expenses that she had paid out on the new location. (Badgerow depo. at 188). Badgerow concedes that Walters did this out of the goodness of his heart to help her out. *Id.*

Contemporaneous with the events surrounding the new Houma office, Badgerow considered the arrangement to be the fulfillment of a life goal because she was going to have her own name on the business sign. (Badgerow depo. Exhibit B-40). She cried as she watched the sign being installed. *Id.* She described the office as "frickin awesome!" (*Id.* Exhibit 41). Considering that Walters was under no obligation to come up with a compromise solution and could have terminated Badgerow at any time with legal impunity, it is truly unfortunate that Badgerow now characterizes the Houma move in a negative light.

In sum, Badgerow has failed to present a prima facie case of retaliation because she did not engage in protected activity, and even if she did, she cannot present a prima facie case of causation. The prima facie case aside, Badgerow has not created an issue of fact as to but for causation. WMT is entitled to judgment as a matter of law on the federal and state law retaliation claim.

### 3. *Gender Discrimination—Disparate Treatment*

Badgerow bases her claim for individual gender discrimination on failing to update her marketing materials, excluding her from overnight fishing and hunting trips, denying her a promotion to Financial Advisor, paying her less than male employees, and

requiring her to punch a time clock.

WMT argues that many of the acts that Badgerow complains about do not constitute adverse employment actions and even if they do, Badgerow has not identified any similarly situated males who were treated more favorably.

Circumstantial evidence of gender discrimination is evaluated under the three-step *McDonnell Douglas* framework. *Barrientos v. City of Eagle Pass*, 444 Fed. Appx. 756, 758 (5th Cir. 2011) (not published). To survive summary judgment ,a plaintiff must first create a presumption of intentional discrimination by establishing a prima facie case. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The burden on the employer at this state "is one of production, not persuasion; it can involve no credibility assessment." *Id.* If the employer sustains its burden then the prima facie case is dissolved, and the burden shifts back to the plaintiff to establish either 1) that the employer's proffered reason is not true but is instead a pretext for discrimination; and 2) that the employer's reason while true is not the only reason for the conduct, and another "motivating factor" is the plaintiff's protected characteristic.[17]

_____

[17] The Court recognizes that the parties' briefing was completed before the class claims were dropped by consent. Much briefing on both sides was dedicated to whether Badgerow could establish that WMT engaged in a pattern or practice of discrimination with respect to females but that issue is now moot. A pattern or practice case is not a separate and free-standing cause of action but rather constitutes a method by which disparate treatment can be shown in class actions. *See Celestine v. Petroleos de Venezuella*, 266 F.3d 343 (5th Cir. 2001), *abrogated on other grounds by Nat'l R.R. v. Morgan*, 536 U.S. 101 (2002) (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1219 (5th Cir. 1999)). In its motion, WMT specifically challenged Badgerow's inability to prevail under the *McDonnell Douglas* burden shifting framework for circumstantial evidence cases *on her individual claims* but Badgerow did not address this argument in her opposition. She makes a passing reference to direct evidence but Badgerow has no direct

*Id.* (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

The prima facie case of gender discrimination requires Plaintiff to establish that 1) she is a member of a protected class, 2) she suffered an adverse employment action, and 3) others outside the protected class were treated more favorably. *Bouvier v. Northrup Grumman Ship Sys., Inc.*, 350 Fed. Appx. 917, 921 (5th Cir. 2009) (not published) (citing *McDonnell Douglas*, 411 U.S. at 802). An adverse employment action includes only "ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Id.* (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007)). A gender discrimination plaintiff must also identify individuals outside the protected class that were "similarly situated" or in "nearly identical" circumstances who were treated more favorably. *Barrientos*, 444 Fed. Appx. at 759 (citing *Wheeler v. BL Develop. Corp.*, 415 F.3d 399,406 (5th Cir. 2005); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 405-06 (5th Cir. 1999); *Gilbert v. Brookshire Grocery Co.*, 354 Fed. Appx. 953 (5th Cir. 2009)).

WMT argues that Badgerow's claims regarding marketing materials, hunting and fishing trips, and clocking in/out do not support a prima facie case for discrimination because they are not adverse employment actions.[18] The Court agrees. These acts are not akin to ultimate employment decisions. As WMT points out, Badgerow cannot

---

evidence of gender discrimination. Direct evidence is that which proves discrimination without inference or presumption. *Barrientos*, 444 Fed. Appx. at 758. All of Badgerow's evidence is circumstantial.

[18] In her opposition Badgerow did not attempt to refute WMT's contention that the claims regarding marketing materials, hunting and fishing trips, and clocking in/out do not implicate ultimate employment decisions.

demonstrate that any of these omissions or acts impacted her employment in any way. Badgerow has not offered a scintilla of evidence to suggest that problems with her business cards (marketing materials) or exclusion from hunting trips prevented her from networking with clients or building a book of business. Moreover, as to the overnight hunting and fishing trips and time clock, Badgerow has offered no evidence that similarly situated male employees were brought on those trips with Walters or that they did not have to punch a time clock. Badgerow did not refute Walters' assertion that only clients, not AFAs whether male or female, were invited to attend the occasional hunting and fishing trips. (Rec. Doc. 73-4, Exhibit A Walters' decl.). Even Thomas Meyer, one of the other WMT principals, never went on hunting or fishing trips sponsored by WMT for clients. (Rec. Doc. 73-7, Exhibit K Thomas Meyer decl.). Badgerow did not refute Meyer's contention that all AFAs who had not yet established themselves as being self-sufficient had to clock in and out. (Rec. Doc. 73-7, Exhibit L Meyer depo. at 45-46). Nathan Meyer, Chris Callahan, and John Meyer all were required to clock in and out just like Badgerow.[19] (Badgerow depo. at 283).

Badgerow claims that she was discriminated against on the basis of gender because she was not promoted to Financial Advisor after two years with WMT. Badgerow alleges in her Complaint that Walters told her that she was promoted but about a month later Meyer sent out an email stating that all AFAs would keep that title until they completed five years of service.[20] (Rec. Doc. 1, Complaint ¶ 23). WMT argues

---

[19] As discussed below, for all claims where comparators are necessary, Badgerow repeatedly compares herself to senior male employees that were not similarly situated to her.

[20] Badgerow does not address the viability of this claim in her opposition. Arguably she has waived this claim because at the summary judgment stage Badgerow can no longer rely on the

that Badgerow has no evidence that she was actually denied a promotion to Financial Advisor and that the refusal to give Badgerow that title was not an adverse employment decision.

In Ameriprise's titling structure, only Walters, Meyer, and Trosclair—the actual franchisees and owners of the business—were Financial Advisors. Everyone else was an associate or AFA regardless of the number of years completed. (Badgerow depo. at 97-98; Walters depo. at 22). Apparently some WMT managers did allow some AFAs to put "Financial Advisor" on their business cards. Badgerow testified that this was done at the discretion of management. (Badgerow depo. at 97). But Walters testified that he was unaware of this practice until Badgerow brought it up to him and that everyone other than the principals was introduced as an associate. (Walters depo. at 22). Walters' unrefuted testimony is that he never even knew about promoting an AFA to a Financial Advisor because you simply cannot do it under Ameriprise's titling structure.[21] (Walters depo. at 23).

This claim fails as a matter of law because Badgerow has not shown that use of the Financial Advisor title, which involved no difference in job duties, benefits, or pay was akin to a promotion. Badgerow has not even attempted to show that not being able to use the title impeded her ability to attract clients. In other words, Badgerow cannot

---

unsupported allegations of her Complaint, many of which have now been refuted by the evidence obtained in discovery.

[21] This testimony remains unrefuted because the unsupported allegations of paragraph 23 of the Complaint aside, Badgerow never testified that Walters had actually told her that she would be able to use the Financial Advisor title after two years. Thus, paragraph 13 of Badgerow's Complaint, in which she alleges that she had an agreement with WMT when she was hired that after two years she could use the Financial Advisor title, is unsupported even by Badgerow's own testimony.

satisfy the adverse employment action prong of a prima facie case of disparate treatment.

Moreover, Badgerow acknowledged that use of the Financial Advisor title was strictly at management's discretion so no AFA was guaranteed automatic use of the title after two years of service. Badgerow has made much of the fact that Meyer changed the policy to five years in order to deprive her of the title but Walters was the principal that Badgerow reported to and was the only WMT manager who could have or would have given her the title and his unrefuted testimony is that he did not exercise his discretion to do that (in fact, he testified that he knew nothing about it). Therefore, Meyer's policy change did not deprive Badgerow of the Financial Advisor title because Walters never gave it to her. Moreover, Badgerow was not the only employee affected by the policy change because John Meyer, Chris Callahan, and Nathan Walters—all of whom were male AFAs—would also have to wait five years to even be eligible to use the title. That the policy had been different at one time does not necessarily make the change discriminatory.[22]

Badgerow's final disparate treatment claim is that she was paid less than other male AFAs at WMT. When Badgerow started with WMT she did not have an AFA license so she could not earn commissions. Badgerow was paid a salary of $30,000 per year. Once Badgerow passed her Series 7 exam and became an AFA, Badgerow was able to earn commissions on sales. As an AFA, Badgerow was paid on a salary draw plus

---

[22] Even as to Petey Kern, David Ponson, and Andrew Walters, male AFAs with more seniority who were allowed to use the Financial Advisor title, Badgerow produced no evidence that they were allowed to use the title right at two years, regardless of what the policy had been in the past. This evidence would be important since use of the illusory title was not self-executing and was subject to managerial discretion.

commission basis which means that the amount of the draw must be repaid by deducting it from the commissions earned. As the Court appreciates Badgerow's disparate pay claim, she believes that the male AFAs received a salary plus commissions pay arrangement, and that she was given the more onerous salary draw plus commissions arrangement due to her gender.

This claim fails because Badgerow has not identified individuals outside the protected class (in other words, males) that were "similarly situated" or in "nearly identical" circumstances to her and who were treated more favorably. As alluded to in note 19 above, the fallacy of Badgerow's position is that in this litigation she has repeatedly compared herself to Petey Kern, David Ponson, and Andrew Walters. Badgerow did not become a licensed AFA (and therefore eligible to earn commissions) until February 2014. Meanwhile, Kern was an AFA who was hired in 2004, approximately 10 years before Badgerow was hired. (Rec. Doc. 73-7, Kylie Kern decl. ¶ 13). David Ponson was hired by WMT as an AFA in July 2006, approximately 8 years before Badgerow was hired. *Id.* at ¶ 14. Andrew Walters was hired in July 2011, and became an AFA in March 2012, approximately 2 years before Badgerow was hired. *Id.* at ¶ 15. Kern and Ponson had a significant amount of seniority over Badgerow, and while Andrew Walters only had two years of seniority over Badgerow, he was Greg Walters' nephew. These more senior AFAs had a significant book of client business that Badgerow, who was new to the business and without significant clients of her own, could not compare to. (Badgerow depo. Exhibit B-18 WMTA 000806 CONFIDENTIAL). Although it is not necessary to justify why these employees had a more attractive compensation package, they also had additional job responsibilities that served the

entire practice. (Rec. Doc. 73-6, Walters depo. at 33-35). Badgerow has not demonstrated that Petey Kern, David Ponson, and Andrew Walters are appropriate comparators because she has not demonstrated that she was similarly situated to these male employees in either years of service or job responsibilities.

When Badgerow filed her EEOC intake questionnaire she identified Nathan Walters, John Meyer, and Christopher Callahan (in addition to Andrew Walters from above) as her male comparators. (Badgerow depo. Exhibit B-23). Badgerow, Nathan Walters, John Meyer, and Chris Callahan all became AFAs and therefore able to earn commissions within approximately one year of each other. (Rec. Doc. 73-7, Kern decl. ¶¶ 12, 16-18). These AFAs were the ones most similarly situated to Badgerow.

Badgerow, Nathan Walters, John Meyer, and Chris Callahan were each paid by the same salary draw applied against the amount of their commissions during their employment with WMT. *Id.* ¶ 19. None of them were paid a fixed salary plus commissions at any time while employed with WMT. *Id.* Badgerow earned significantly more in commissions than any of these male comparators. (Badgerow depo. at 107). Badgerow has produced no evidence to the contrary.[23]

Badgerow alleged in her Complaint that even as to these male comparators, her salary draw was different because their salary draw was calculated on a per pay period basis as opposed to an annual pay period basis like hers. (Complaint ¶ 62). Badgerow

---

[23] Badgerow attempted to delay consideration of WMT's motion for summary judgment by claiming that more discovery was necessary, including the deposition of Kylie Kern. (Rec. Doc. 84, Motion to Continue Submission Date). Badgerow has not demonstrated that additional discovery would help her to defeat summary judgment. And as to Kern, she was the office manager at WMT, she was the only other person present when Walters terminated Badgerow, and she lives in Louisiana. Badgerow has offered no justification for her own failure to prioritize deposing this witness.

has produced no evidence of this allegation but she does quote at length from Thomas Meyer's deposition in her opposition. Specifically, Meyer was asked: "What was – how are John and Chris paid differently from Denise Badgerow?" Meyer answered: "John and Chris were not paid commissions if they didn't exceed their bi-weekly pay. Denise did not receive commissions unless she exceeded her bi-weekly pay." (Rec. Doc. 130-8, Exhibit 7 Meyer depo. at 100). Badgerow makes no attempt to explain how this statement evinces a difference in the way that the commissions were paid, and she has provided no expert testimony to demonstrate the economic implications of any such difference. When Badgerow's counsel pressed Meyer to explain how Badgerow might be paid differently than John and Chris, he answered that he would have to defer to Walters on that because Walters was the principal who dealt with Badgerow on her compensation package. *Id*. at 102

In sum, WMT is entitled to judgment as a matter of law on Badgerow's federal and state gender discrimination claim based on disparate treatment.

### 4. *Equal Pay Act*

Under the Equal Pay Act, 29 U.S.C. § 206(d)(1), a plaintiff in Badgerow's position must establish a prima facie case by demonstrating that the employer compensates employees of the opposite sex differently for equal work. *See Siler-Khodr v. Univ. of Tex. Health Science Ctr.*, 261 F.3d 542, 546 (5th Cir. 2001). Badgerow's Equal Pay Act prima facie case fails for the same reason that her Title VII disparate pay claim failed. Badgerow has not shown that any similarly situated male employee at WMT was treated more favorably in terms of compensation or received more pay for the same work. WMT is entitled to judgment as a matter of law on this claim.

### 5. *Breach of Contract*

As alleged in her Complaint, Badgerow claims that she had a verbal agreement with WMT that she would receive compensation of $30,000/year in base salary plus commissions once she became an AFA. (Complaint ¶ 48). Badgerow alleges that when she made a large commissioned sale in October 2014, Kylie Kern informed her that WMT had determined to retroactively change her compensation structure so that she would no longer receive a guaranteed salary of $30,000 in addition to commissions.[24] *Id.*¶ 15. Instead, from that point forward, she received a salary draw plus commissions.[25] *Id.*

A contract is formed by the consent of the parties established through offer and acceptance. *Read v. Willwoods Cmty.*, 165 So. 3d 883, 887 (La. 2015) (citing La. Civ.

---

[24] Badgerow has never expressly claimed that the salary draw was a 'recoverable" one meaning that she would have had to pay back the salary draw at the end of the year if she had not generated at least $30,000 in Gross Dealer Concessions ("GDC") to cover the draw. On the other hand, in October 2014 when Badgerow first began to receive commissions, she either agreed to or was required to (this point is disputed) set aside two pay periods worth of her salary draw so that she would be covered in the event that her GDC during any subsequent month fell below the amount of her draw. Nonetheless, recovery of the draw was never an issue because Badgerow earned significant commissions based on the clients that Walters referred to her.

[25] Even though we are at the summary judgment stage of this matter, the Court has returned to the allegations of the Complaint to define the breach of contract claim because Badgerow's testimony as to this cause of action is inconsistent and contradictory. At one point in her deposition, Badgerow confirmed that she was claiming, consistent with her Complaint, that when she was originally hired she was offered a salary plus commission and that this arrangement changed to a salary draw once she began earning commissions. (Badgerow depo. at 113). But later in the deposition when WMT's counsel questioned Badgerow about post-termination statements that she made to an Ameriprise representative, she conceded that the allegations in her Complaint were incorrect, and that she had verbally agreed to be paid a salary draw plus commissions but later learned that others were paid a straight salary plus commissions. *Id.* at 72. After a series of argumentative and non-responsive answers on this topic, Badgerow conceded that her original verbal deal with WMT was to receive a salary draw plus commissions. *Id.* at 74; 147. But later in the deposition when questioned by her own counsel Badgerow went back to claiming that when she was hired she was told she would get a salary plus commissions. *Id.* at 259.

Code art. 1927). Thus, an enforceable contract requires a meeting of the minds. *Id.* (citing *State v. Pelas*, 745 So. 2d 1215 (La. App. 1st Cir. 1999)). Unless the law requires a certain formality, offer and acceptance can be made orally. *Id.* (citing La. Civ. Code art. 1927).

In order for Badgerow to succeed on her breach of contract claim she must prove that when WMT hired her she had an agreement to receive a salary plus commissions as opposed to a salary draw plus commissions. Badgerow need not prove her claim by a preponderance of the evidence at this juncture, but she cannot defeat summary judgment if her own evidence, taken as true with all inferences drawn in her favor, fails as a matter of law to establish the existence of a contract. If Badgerow's own evidence fails as a matter of law to establish the existence of a contract, Badgerow cannot avoid summary judgment by claiming that WMT's denial of a contract creates a triable issue of fact.

It is undisputed that Badgerow and WMT did not enter into a written contract regarding the compensation agreement. Therefore, the alleged contract that Badgerow sues upon would necessarily have been oral. It is also undisputed that Greg Walters is the only person at WMT who talked to Badgerow about her compensation when she was hired. (Badgerow depo. at 37).

At her deposition, WMT's counsel had asked Badgerow about the discussions related to compensation that she had when she was preparing to join WMT. Badgerow could not recall anything specific about when discussions regarding compensation took place but she guessed that maybe it was very near to the date when she actually got hired. (Badgerow depo. at 27). Badgerow quit her prior employment with a bank and

accepted a position with WMT because of the opportunities that she believed she would have to be a financial advisor. *Id*. at 28. Badgerow did not have any of the details of her compensation at that point in time. *Id*. at 30. When asked about the deal she negotiated with Greg Walters when she came on board, Badgerow's answer was that Walters made the compensation comparable to what she was receiving at her prior job but Badgerow could not remember any of the details related to compensation at the bank. *Id*. at 32. But the prior job did not involve commissions and when Badgerow joined WMT she was not an AFA so commissions were not an issue. She made a straight $30,000/year salary as a paraplanner. *Id*. at 33.

When WMT's counsel asked Badgerow whether commissions had been part of the conversation with Walters, Badgerow was somewhat evasive, answering that she didn't have any clients and was not licensed as an AFA anyway. *Id*. at 34. That's when Badgerow testified that she had a discussion with Walters about commissions and he told her that she would get paid commissions the same as the other advisors on the scale.[26] *Id*. at 34. When asked when the conversation occurred Badgerow could not recall. *Id*. at 35. When asked how she came to understand that the $30,000 would be guaranteed (as opposed to a draw against commissions) in her initial conversation with Greg Walters, Badgerow stated that "I assumed." *Id*. at 68. When asked if Greg actually said that, Badgerow replied, "I do not recall." *Id*.

The foregoing testimony eviscerates Badgerow's breach of contract claim. This testimony demonstrates that Badgerow and Walters did not have a meeting of the minds

---

[26] Badgerow has produced no evidence that she was not paid on the same commissions scale as the other AFAs.

regarding a guaranteed salary plus commissions. In fact, Badgerow merely assumed that this would be her compensation arrangement.

But even if Badgerow had an original agreement as to a guaranteed salary plus commissions, her breach of contract claim would fail nevertheless because the undisputed evidence establishes that she agreed to change that agreement to a salary draw plus commissions arrangement. During her deposition Badgerow was questioned about an Ameriprise document that was prepared by an Ameriprise human resources representative after Badgerow was terminated. Badgerow had contacted Ameriprise to complain about her termination. According to the narrative, Badgerow told the Ameriprise representative that she had verbally agreed to be paid a salary draw plus commissions. (Badgerow depo. Exhibit B-16). WMT's counsel asked Badgerow if she had agreed to have a salary draw plus commissions and she said, "I did, yes." (Badgerow depo. at 71). And in her testimony at FINRA arbitration, Badgerow confirmed that when she began to earn commissions after becoming an AFA, it was on a draw against commissions basis, and that she had agreed to that. (Rec. Doc. 73-6, FINRA transcript at 238-39). Presumably the change in the compensation agreement occurred when Badgerow says that it did—when she made the large commissioned sale in October 2014—but it is clear from Badgerow's own testimony that any such change occurred by agreement.[27]

---

[27] Although a moot point at this juncture, certain aspects of Badgerow's breach of contract claim cast a broad specter of implausibility. First, when Badgerow was hired she had no clients, no experience, and no AFA license. The evidence has shown that only the most senior AFAs with years of experience and large books of business were given a guaranteed salary plus commissions. One would question then why WMT would have offered Badgerow the same compensation arrangement as proven, experienced AFAs. None of the other AFAs who were hired near in time to Badgerow had a guaranteed salary arrangement.

In sum, Badgerow has failed to establish that she had an agreement with WMT to receive a salary plus commissions. Even if she did have such an agreement at one time, Badgerow agreed to change it to a salary draw plus commissions arrangement. WMT is entitled to judgment as a matter of law n Badgerow's breach of contract claim.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** the **Motion for Summary Judgment (Rec. Doc. 73)** filed by defendant REJ Properties, Inc. d/b/a Walters, Meyer, Trosclair & Associates is **GRANTED**. Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER ORDERED** that a Rule 54(b) final judgment will be entered in favor of defendant REJ Properties, Inc. d/b/a Walters, Meyer, Trosclair & Associates because the Court has expressly determined that there is no just reason for delay.[28]

May 28, 2019

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

---

Second, it is undisputed that Badgerow did not receive commissions until October 2014. If Badgerow had been on a guaranteed salary plus commissions arrangement from the beginning, then surely she would have complained about receiving no commissions between March 2014 and October 2014, when her GDC from March to September 2014 was $23,042. (Rec. Doc. 73-7, Exhibit G Kern decl. ¶ 21).

Finally, Walters and Badgerow were very close and worked closely together. If he had agreed to pay her a guaranteed salary plus commissions (upon becoming an AFA) when she was hired, it seems highly unlikely that Badgerow would have stood for having Kylie Kern, the office manager, alter the agreement to the less attractive salary draw plus commission arrangement. Yet this is Badgerow's testimony. (Badgerow depo. at 258). Badgerow does not even allude to a conversation with Walters or any other WMT principal in the October 2014 timeframe when she claims that her compensation agreement changed.

[28] The Court is directing entry of a partial but final judgment because the only issue remaining in this litigation is confirmation of the arbitration award, which does not involve Badgerow's claims against WMT in this lawsuit. Even though the validity of the arbitration award is before this Court, Badgerow filed a second lawsuit in state court that purports to attack the arbitration award. That case has been removed and must be addressed. The Court sees no reason to allow issues related to the arbitration to delay entry of a judgment in favor of WMT.